[Civ. No. 40999. Second Dist., Div. Five. July 3, 1974.]

IRVING D. AARON et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant.

## COUNSEL

Burt Pines and Roger Arnebergh, City Attorneys, Milton N. Sherman, Chief Assistant City Attorney, John F. Haggerty, Assistant City Attorney, and James H. Pearson, Deputy City Attorney, for Defendant and Appellant.

Ellis & Sloan, Lyle C. Ellis and James E. Sloan for Plaintiffs and Respondents.

## OPINION

**ASHBY, J.**—Defendant appeals from a judgment in inverse condemnation in favor of numerous individual plaintiffs following a trial by the court. The issue in this appeal is whether the City of Los Angeles (City), as owner and operator of Los Angeles International Airport (LAX), is liable in inverse condemnation to owners of residential property in the neighborhood of the airport which is damaged and reduced in market value by the noise from jet aircraft taking off and landing at the airport. The trial court answered this question in the affirmative, and granted judgment against the City with respect to 520 parcels of such property. We have concluded that the trial court was correct and that the judgment should be affirmed.

### FACTS

Between 1959, when jet aircraft first began using LAX, and 1965, the City permitted gradually increasing numbers of jet flights to and from the airport.[1] These aircraft emit loud and disturbing noises. An acoustical expert with the consulting firm of Bolt, Beranek and Newman prepared a study for the Federal Aviation Administration entitled "1965, 1970, and 1975 Noise Exposure Forecast Areas for Los Angeles International Airport." The purpose of the study was to determine the effects of aircraft noise on land use in areas surrounding the airport. The effective perceived noise

---

[1] The number of jet aircraft landing at Los Angeles International Airport was as follows:

| YEAR | YEARLY NUMBER | AVERAGE DAILY LANDINGS |
|------|---------------|------------------------|
| 1960 | 20,171 | 55 |
| 1961 | 33,932 | 93 |
| 1962 | 47,215 | 129 |
| 1963 | 59,776 | 164 |
| 1964 | 69,503 | 191 |
| 1965 | 86,855 | 238 |

level (EPNL), which measures the annoyance caused by such noise, was determined based on known noise levels of the engines, altitudes, distances, flight paths, and takeoff and landing patterns. Adjustments were made to reflect the number of flights per day and the timing of the flights, since frequent flights and nighttime flights are more annoying to residents. Based on these values three noise exposure forecast (NEF) areas were determined.[2] NEF area C was the one in which jet aircraft noise had the greatest effect upon people below. Single family construction is not recommended in NEF area C because noise is likely to constitute a severe interference with the use of land for that purpose. The bulk of the properties originally involved in this suit are in NEF area C.

A few of the individual plaintiffs testified about the disturbing and annoying effects which the jet noise had on conversations, radio and television viewing and sleep. There was also some testimony that soot, oil and fuel from the aircraft fell on some of the parcels involved causing damage to painted surfaces and preventing homeowners from keeping their cars uncovered or drying clothes in their yards. However, recovery is not sought for the noise and other inconveniences as such, but rather for the diminution in property value caused by them.

Most of the trial was occupied by the testimony of a team of appraisers for plaintiffs. They visited the properties of the named plaintiffs in 1963, heard the jet noise themselves, and prepared appraisals of the properties involved. They appraised the market values of these properties and what their market value would have been if unaffected by jet noise, based on sales of comparable properties in other areas. The trial court determined that 581 of the parcels had been damaged and their market value reduced by the jet noise.[3] The reductions in market value ranged from $400 to $6,000 but were preponderantly in the neighborhood of $1,000. In the judgment the court also granted an easement to the City for flights of jet aircraft in the air space over and near the properties involved, to the extent of such usage in May 1963, which was determined to be the time of the taking or damaging of property in this case.

---

[2]For a readable explanation of this noise measurement technique, see Comment, *Port Noise Complaint* (1970) 6 Harv. Civ. Rights-Civ. Lib. L.Rev. 61, 65-74.

[3]This case originally involved some 750 parcels. The trial court found that some of them had not been damaged. Furthermore, as to 61 of the 581 damaged parcels, the plaintiffs presented inadequate proof of ownership and therefore compensation was granted only as to 520 parcels.

## I

### JET NOISE AS A TAKING OR DAMAGING OF PROPERTY

There is no appellate case in California that squarely holds the municipal operator of an airport liable in inverse condemnation to the owners of residential property in the vicinity of the airport which is damaged and diminished in market value by noise from jet aircraft landing and taking off at the airport. The subject has been treated by numerous legal commentators, however,[4] and we are guided to our conclusion by prior decisions of the California Supreme Court which imply this result, as well as by other California decisional and statutory law and decisions of the United States Supreme Court and courts of sister states.

In the landmark case of *United States* v. *Causby* (1946) 328 U.S. 256 [90 L.Ed. 1206, 66 S.Ct. 1062], the Supreme Court held that frequent low flights over the Causbys' land by military aircraft landing at a nearby airport operated by the United States constituted a taking of the Causbys' property without compensation in violation of the Fifth Amendment of the United States Constitution. The noise from the aircraft rendered it impossible to continue the use of the property as a commercial chicken farm. Although the flights did not completely destroy the enjoyment and use of the land, they were held to be so low and frequent as to constitute a direct and immediate interference with the full enjoyment of the land, limiting the utility of the land and causing a diminution in its value, and therefore constituted a taking under the Fifth Amendment.

In the other major Supreme Court decision on this issue, *Griggs* v. *Allegheny County* (1962) 369 U.S. 84 [7 L.Ed.2d 585, 82 S.Ct. 531], the court held that Allegheny County, which owned and operated the Greater Pittsburgh Airport, was liable for a taking of property under the Fifth Amendment where the noise from aircraft taking off and landing at the airport on

---

[4]Many useful authorities are collected in *City of Oakland* v. *Nutter,* 13 Cal.App.3d 752, 761, fn. 7 [92 Cal.Rptr. 347]; and in Berger, *You Know I Can't Hear You When the Planes Are Flying* (1972) 4 Urban Law. 1, fn. 3. Additional authorities not listed in those footnotes include Russell, *Recent Developments in Inverse Condemnation of Air Space* (1973) 39 J. Air L. & Com. 81; Vittek, *Airport Noise Control—Can Communities Live Without It? Can Airlines Live With It?* (1972) 38 J. Air L. & Com. 473; Berger, *The California Supreme Court—A Shield Against Governmental Overreaching: Nestle* v. *City of Santa Monica* (1973) 9 Cal. Western L.Rev. 199; Note, *Airport Noise: An Inadequate Judicial Response* (1972) 4 Conn.L.Rev. 634; Spater, *Noise and the Law* (1965) 63 Mich.L.Rev. 1373.

Although the subject was studied by the California Law Revision Commission, the commission decided not to recommend legislation pending clarification by the courts. (10 Cal.L.Revision Com. Rep. (1971) pp. 1001, 1013.)

flight paths over the Griggs' property rendered the property undesirable and unbearable for residential use. The court saw no difference between the county's responsibility to pay for the land on which the runways were built and its responsibility for the air easements necessary for operation of the airport. "The glide path for the northeast runway is as necessary for the operation of the airport as is a surface right of way for operation of a bridge, or as is the land for the operation of a dam. [Citation.] As stated by the Supreme Court of Washington in *Ackerman* v. *Port of Seattle*, 55 Wash.2d 401 [*sic* 400], 413, 348 P.2d 664, 671, '. . . an adequate approach way is as necessary a part of an airport as is the ground on which the airstrip, itself, is constructed . . . .' Without the 'approach areas,' an airport is indeed not operable. Respondent in designing it had to acquire some private property. Our conclusion is that by constitutional standards it did not acquire enough." (369 U.S. at p. 90 [7 L.Ed.2d at p. 589].)

A federal circuit court has narrowly interpreted *Causby* and *Griggs* to mean that there is no taking under the Fifth Amendment unless the aircraft invade the air space directly over the plaintiff's property and the property is rendered uninhabitable. (*Batten* v. *United States* (10th Cir. 1962) 306 F.2d 580, cert. den., 371 U.S. 955 [9 L.Ed.2d 502, 83 S.Ct. 506], rehg. den., 372 U.S. 925 [9 L.Ed.2d 731, 83 S.Ct. 718].) However, several states have interpreted their own constitutions to require compensation under less strict circumstances when the noise from aircraft has diminished the market value of the homeowner's property.

The leading case is *Thornburg* v. *Port of Portland* (1962) 233 Ore. 178 [376 P.2d 100], second appeal (1966) 244 Ore. 69 [415 P.2d 750]. There the Oregon Supreme Court rejected any arbitrary limitations based upon the altitude of the particular aircraft or upon a technical trespass of the air space directly over the homeowner's land. The court held that there could be a taking whenever the government acts in such a way as substantially to deprive an owner of the useful possession of his property. (*Thornburg* v. *Port of Portland, supra,* 376 P.2d at p. 106.) In the second appeal the court held: "The proper test to determine whether there has been a compensable invasion of the individual's property rights in a case of this kind is whether the interference with use and enjoyment is sufficiently direct, sufficiently peculiar, and of sufficient magnitude to support a conclusion that the interference has reduced the fair market value of the plaintiff's land by a sum certain in money. If so, justice as between the state and the citizen requires the burden imposed to be borne by the public and not by the individual alone." (*Thornburg* v. *Port of Portland, supra,* 415 P.2d at p. 752.)

Similarly in *Martin* v. *Port of Seattle* (1964) 64 Wn.2d 309 [391 P.2d 540], cert. den., 379 U.S. 989 [13 L.Ed.2d 610, 85 S.Ct. 701], the Supreme Court of Washington held that there should be no arbitrary distinction between property directly overflown by jet aircraft and that which is not. The court noted that article I, section 16, amendment 9 of the Washington Constitution refers to a "taking" or "damaging" of property (as does art. I, § 14 of the Cal. Const.) and thus is broader than the "taking" provision of the United States Constitution. The court found it unnecessary to become "embroiled" in this distinction, however, because in the prior Washington decision of *Ackerman* v. *Port of Seattle* (1960) 55 Wn.2d 400 [348 P.2d 664, 77 A.L.R.2d 1344] (quoted by the United States Supreme Court in *Griggs* v. *Allegheny County, supra*), property was defined to include the unrestricted right to use, enjoy, and dispose of the land, and the frequent flight of aircraft over the land reducing its market value was held. to be a compensable taking of an easement. In *Martin* the court held that where the flights in question caused such interference with the use and enjoyment of the property as to result in a measurable diminishment in market value, the government and not the individual homeowner should be required to bear that burden.

*Thornburg* was followed in *City of Jacksonville* v. *Schumann* (Fla.App. 1964) 167 So.2d 95, 99-102, second appeal (Fla.App. 1967) 199 So.2d 727, 729, cert. den., 390 U.S. 981 [19 L.Ed.2d 1278, 88 S.Ct. 1101], and in *Johnson* v. *City of Greeneville* (1968) 222 Tenn. 260 [435 S.W.2d 476, 478-480].

An examination of existing California law suggests that California should adopt an approach similar to that of *Thornburg* and *Martin*.

California's landmark case dealing with the problem of noise from jets taking off and landing at an airport is *Loma Portal Civic Club* v. *American Airlines, Inc.,* 61 Cal.2d 582 [39 Cal.Rptr. 708, 394 P.2d 548]. In that case the residents of a neighborhood in the flight path of jet aircraft using Lindbergh Field in San Diego sought to enjoin the airlines from flying at low altitudes in close proximity to plaintiffs' residences in such manner and times as to interfere unreasonably with the normal use and enjoyment by plaintiffs of their homes. The Supreme Court held "that under the facts of this case, i.e., the operation of aircraft with federal airworthiness certificates in federally-certificated, scheduled passenger service, in conformity with federal safety regulations, in a manner not creating imminent danger, and in furtherance of the public interest in safe, regular air transportation of goods and passengers, an injunction is not available." (*Id.,* at p. 591.)

The court stressed, however, that plaintiffs did not seek damages and had not named the operator of the airport as a party. (*Id.*, at pp. 585-586 and fn. 1.) In stating its holding the court emphasized: "Nothing herein is intended to be a determination of the rights of landowners who suffer from airplane annoyances to seek damages from the owners or operators of aircraft or to seek compensation from the owner or operator of an airport." (*Id.*, at pp. 590-591.) The court also stated: "Finally, it is clear, of course, that state courts have jurisdiction to award compensation for a 'taking,' without regard to whether the overflights conform to federal law, when such relief is appropriate." (*Id.*, at p. 594. See also *Anderson* v. *Souza*, 38 Cal.2d 825, 838-839 [243 P.2d 497].)

Our Supreme Court faced this problem a second time in *Nestle* v. *City of Santa Monica*, 6 Cal.3d 920 [101 Cal.Rptr. 568, 496 P.2d 480]. In that case property owners in the vicinity of Santa Monica Airport sued the city for both property and personal injury damages on the ground that vibrations, fumes, and noise from jets landing and taking off at the airport caused damage to their property, interfered with free enjoyment of the property and resulted in pain, suffering and emotional disturbance. They had four theories: (1) inverse condemnation, (2) nuisance, (3) negligence, (4) zoning violations. Only the inverse condemnation count went to trial, and as to it the trial court gave judgment to the defendant on the ground that plaintiffs had failed to prove their property was damaged. The trial court dismissed the other counts, rejecting the nuisance theory on grounds of governmental immunity.

The Supreme Court's opinion does not resolve the question of liability in inverse condemnation which faces us in this case. This is because the trial court had found in favor of the defendant on the issues of excessive noise and diminution in property values, and the Supreme Court merely held that the trial court's finding was supported by substantial evidence. (*Id.*, at pp. 925-928.)

However, the Supreme Court reversed as to the nuisance count, holding that Government Code section 815 does not give immunity to the city for operating an airport in a manner constituting a nuisance. (*Id.*, at pp. 931-937.) The court felt that its conclusion was "further supported by the profound interest the 1970 Legislature demonstrated in the eradication of the evils caused by the various forms of pollution, with particular emphasis on noise pollution. Since it is well-documented that a nuisance theory provides an effective means for redress in a wide range of actions resulting from pollution including noise disturbance, it appears that, in deleting the [Law Revision] commission's recommendation to preclude govern-

mental nuisance liability, the Legislature intended to preserve this additional weapon in the arsenal available to combat grievous injury to the environment." (*Id.*, at pp. 936-937; fns. omitted.)

The court's discussion in *Nestle* indicates that public policy does not preclude the imposition of liability on the City in the instant case. There is a very close relation between the concepts of inverse condemnation and nuisance by a governmental entity.[5]

Another recent case which suggests the result we reach is *City of Oakland* v. *Nutter, supra,* 13 Cal.App.3d 752. In that case the city brought an action as condemner to acquire an air easement in the air space above described real property for airport purposes, in order to protect the approaches of the airport from hazardous encroachment of structures or vegetable life, pursuant to Code of Civil Procedure section 1239.2. The court held that the noise and other interference with the remaining property engendered by the use of this easement could be considered in determining severance damages. (*Id.*, at pp. 765-775.)[6]

Several California cases have found that zoning restrictions intended to facilitate the operation of an airport and to protect the approaches to it may constitute a taking of property. (Compare *Sneed* v. *County of Riverside,* 218 Cal.App.2d 205 [32 Cal.Rptr. 318]; *Peacock* v. *County of Sacramento,* 271 Cal.App.2d 845 [77 Cal.Rptr. 391]; *Kissinger* v. *City of Los Angeles,* 161 Cal.App.2d 454 [327 P.2d 10]; with *Morse* v. *County of San Luis Obispo,* 247 Cal.App.2d 600 [55 Cal.Rptr. 710]; *Smith* v. *County of Santa Barbara,* 243 Cal.App.2d 126 [52 Cal.Rptr. 292].)[7]

█ We also find support for our conclusion in Code of Civil Procedure section 1239.3. It provides: "Airspace above the surface of property or an

---

[5]Van Alstyne, *Just Compensation of Intangible Detriment: Criteria for Legislative Modifications in California* (1969) 16 U.C.L.A. L.Rev. 491, 525, fn. 130; Fadem & Berger, *A Noisy Airport Is a Damned Nuisance!* (1971) 3 Sw. Univ. L. Rev. 39, 48, fn. 35; Stoebuck, *Condemnation by Nuisance: The Airport Cases in Retrospect and Prospect* (1967) 71 Dick. L.Rev. 207, 209; *Thornburg* v. *Port of Portland, supra,* 376 P.2d at pp. 105-107. To date inverse condemnation has been the most successful theory for plaintiffs seeking relief against aircraft noise. Comment, *The Jet-Set and the Law: A Summary of Recent Developments in Noise Law as It Relates to Airport and Aircraft Operations in California* (1970) 1 Pacific L.J. 581, 588.

[6]Mr. Justice Sims' opinion in *Nutter* contains a thorough discussion of authorities relating to many of the issues raised in this case. The question in *Nutter,* however, was narrowly framed in the context of severance damages, and the court was not required to decide several of these issues.

[7]The airport approaches zoning law recognizes that zoning restrictions may in some cases constitute a taking of property. (Gov. Code, §§ 50485.2, 50485.13.)

air easement in such airspace may be acquired under this title by a county, city, port district, or airport district if such taking is necessary to provide an area in which excessive noise, vibration, discomfort, inconvenience or interference with the use and enjoyment of real property located adjacent to or in the vicinity of an airport and any reduction in the market value of real property by reason thereof will occur through the operation of aircraft to and from the airport."

The enactment of section 1239.3 recognizes that the use of air space in which excessive noise interferes with the use and enjoyment of real property in the vicinity of the airport may constitute a taking by the airport. This section was enacted to permit the appropriate governmental bodies to take the initiative in securing rights which might otherwise be subject to inverse condemnation proceedings. (*City of Oakland* v. *Nutter, supra,* 13 Cal.App. 3d 752, 766; Review of Selected 1965 Code Legislation (Cont.Ed.Bar) pp. 88-89.)

Although section 1239.3 was enacted in 1965, after the cause of action arose in the instant case, it is indicative of legislative policy. The court in *City of Oakland* v. *Nutter, supra,* stated: "The adoption of section 1239.3 does not indicate that the factors set forth therein are not to be considered in an action to condemn under the earlier adopted sections, either before or after 1965."

The City contends that the inconveniences and noise damage suffered by residents near the airport do not amount to a taking of property but instead are merely "consequential" damages which plaintiffs must suffer without compensation. The City relies upon *People* v. *Symons,* 54 Cal.2d 855, 858-859 [9 Cal.Rptr. 363, 357 P.2d 451], where it is stated (quoting *Eachus* v. *Los Angeles etc. Ry. Co.,* 103 Cal. 614, 617 [37 P. 750]): " 'The Constitution does not, however, authorize a remedy for every diminution in the value of property that is caused by a public improvement. The damage for which compensation is to be made is a damage to the property itself, and does not include a mere infringement of the owner's personal pleasure or enjoyment. Merely rendering private property less desirable for certain purposes, or even causing personal annoyance or discomfort in its use, will not constitute the damage contemplated by the Constitution; but the property itself must suffer some diminution in substance, or be rendered intrinsically less valuable by reason of the public use. . . .' "

In that case the court held that the homeowner, whose neighbor's property was taken for a freeway and whose own property was partially taken in order to provide a turn around area, could not recover severance dam-

ages for such general factors as noise, fumes and dust from the freeway. Other freeway noise cases are collected and thoroughly analyzed in *People ex rel. Dept. Pub. Wks.* v. *Volunteers of America,* 21 Cal.App.3d 111 [98 Cal.Rptr. 423, 51 A.L.R.3d 844].

As the trial court found, however, the noise from jet aircraft landing and taking off at the airport is a severe disturbance to the enjoyment and use of residential property in the area and is significantly greater than the noise emanating from a freeway. (See Comment, *supra,* fn. 5, 1 Pacific L.J. at pp. 591-592.) In comparing highway and airport noise for this purpose other courts have not treated them as the same. (*Thornburg* v. *Port of Portland, supra,* 376 P.2d 100, 106; compare *City of Jacksonville* v. *Schumann* (Fla.App. 1964) *supra,* 167 So.2d 95, 97 with *Northcutt* v. *State Road Department* (Fla.App. 1968) 209 So.2d 710, 711.)

■ A property owner may be required to bear without compensation incidental damages which are suffered alike by the public in general, but he is entitled to compensation for special and peculiar damage inflicted upon him. (*Richards* v. *Washington Terminal Co.* (1914) 233 U.S. 546, 557 [58 L.Ed. 1088, 1093, 34 S.Ct. 654]; Stoebuck, *supra,* fn. 5, 71 Dick. L.Rev. at pp. 213-214.) In *Richards* the Supreme Court held that a property owner near a railroad track could not recover for the soot and smoke damage suffered generally by all persons along the track, but was entitled to compensation for the special and peculiar damage to his property arising from the fact that an exhaust fan in a tunnel built by the railroad blew additional smoke on his property. (*Id.,* at pp. 555-557 [58 L.Ed. at pp. 1092-1093].) Similarly in this case the construction and operation of the airport by the City causes special and peculiar damage to plaintiffs which is not shared in common by all persons who live along the airways. (*United States* v. *Causby* (1946) *supra,* 328 U.S. 256, 262 [90 L.Ed. 1206, 1210].) As stated by our Supreme Court in *Loma Portal Civic Club* v. *American Airlines, Inc., supra,* 61 Cal.2d 582, 584: "The problems [of noise and vibrations from jet aircraft] are *peculiarly acute for landowners near airports, who suffer not only from the increase in the general noise level but particularly from their proximity to the low-level flying which is a necessary part of takeoff and landing.*" (Italics added.) Plaintiffs' damages are not merely incidental and general. (See *City of Oakland* v. *Nutter, supra,* 13 Cal.App.3d 752, 770, 771.)

### Summary

■ Drawing upon the above precedents we may state the rule in terms of California law as follows: The municipal owner and operator of an air-

port is liable for a taking or damaging of property when the owner of property in the vicinity of the airport can show a measurable reduction in market value resulting from the operation of the airport in such manner that the noise from aircraft using the airport causes a substantial interference with the use and enjoyment of the property, and the interference is sufficiently direct and sufficiently peculiar that the owner, if uncompensated, would pay more than his proper share to the public undertaking. (See *Holtz* v. *Superior Court,* 3 Cal.3d 296, 303 [90 Cal.Rptr. 345, 475 P.2d 441].) Whether the interference is substantial enough to meet this standard is a mixed question of fact and law for the trial judge to determine. (See *Breidert* v. *Southern Pac. Co.,* 61 Cal.2d 659, 663-664 [39 Cal.Rptr. 903, 394 P.2d 719], second appeal (272 Cal.App.2d 398, 409 [77 Cal. Rptr. 262]; *Riverside County Flood etc. Dist.* v. *Halman,* 262 Cal.App.2d 510, 516-517 [69 Cal.Rptr. 1].)

## II

### City's Contentions

#### Direct Overflight Rule

The City contends, that plaintiffs may not recover unless they can show their damages result from a physical invasion by the aircraft of the air space directly over plaintiffs' property. (*Batten* v. *United States* (10th Cir. 1962) *supra,* 306 F.2d 580, 583-585; Spater, *supra,* fn. 4, 63 Mich.L.Rev. at p. 1394.) We reject the *Batten* rule as inappropriate for California. We agree with the statement in *Martin* v. *Port of Seattle, supra,* 391 P.2d at page 545: "We are unable to accept the premise that recovery for interference with the use of land should depend upon anything as irrelevant as whether the wing tip of the aircraft passes through some fraction of an inch of the airspace directly above the plaintiff's land. The plaintiffs are not seeking recovery for a technical trespass, but for a combination of circumstances engendered by the nearby flights which interfere with the use and enjoyment of their land."

Another commentator has said: "Restricting recovery to damage caused by overflights makes no sense from a scientific standpoint, and postulates an arbitrary line between compensability and noncompensability that defies logical justification. Technical studies demonstrate that the 'noise-affected' area in the vicinity of airports is not confined to the land directly below aircraft approach and departure paths, but extends for a considerable distance to each side. . . . Moreover, even relatively minor but consistent deviations from prescribed flight patterns may, under the overflight rule,

arbitrarily enlarge or contract the group of property owners who may assert recoverable claims, despite substantially equivalent detrimental effects upon all." (Van Alstyne, *supra*, fn. 5, 16 U.C.L.A. L.Rev at p. 531.)

Modern day noise measurement techniques provide more sophisticated means of drawing the dividing line between compensability and noncompensability.[8]

The Washington Supreme Court in *Martin* concluded that the *Batten* rule is not compelled by *Causby* and *Griggs*. As to those two cases the *Martin* court said: "While a direct overflight or invasion in airspace is in fact involved in each case, it is not clear that the reasoning and approach of those cases is so limited. Realistically, it must be conceded that a major part of the damage in either case was engendered by noise and vibration, whether or not accompanied by a physical displacement of air above the property." (*Martin* v. *Port of Seattle, supra*, 391 P.2d at p. 545.) Other state courts have stated that the dissent in *Batten* represents the better view. (*Thornburg* v. *Port of Portland, supra*, 376 P.2d at p. 104; *Johnson* v. *City of Greeneville, supra*, 435 S.W.2d at p. 479.) The *Batten* rule has been criticized by most commentators.[9]

---

[8]*This point is forcefully made in the trial court's memorandum opinion as follows:* "Since the noise from jet aircraft is capable of acceptable and recognized measurement in terms of its annoyance effect, no reasonable basis exists for making a legal difference between the effects caused by flyby aircraft and the same effects caused by flyover aircraft. Recognition of this principle of equal treatment for the same effects from jet noise is the basis upon which NEF Area 'C' has been designated as the area in which the Effective Perceived Noise Level is such that a substantial interference with residential living results from jet aircraft noise caused by the landings and takeoffs in the vicinity of Los Angeles International Airport.

"It is suggested that unless recovery in inverse condemnation is limited to landowners suffering from flyover aircraft, there will be no reasonable way to draw a line to distinguish between those landowners who would have a cause of action and those who would not. The development of the NEF contour areas provides a good means of drawing a reasonable line between those landowners who may establish a cause of action for inverse condemnation and those who may not. All landowners who suffer from substantially the same noise level are treated on an equal basis. Thus, all landowners located in NEF Area 'C' are subjected to noise from jet aircraft which substantially interferes with residential comfort, enjoyment and use of their property and which is substantiated by the Effective Perceived Noise Level rating in decibels used to delineate NEF Area 'C.' To the extent that they are able to establish that jet aircraft noise has diminished substantially the market value of their property, they should be entitled to recover damages in inverse condemnation. Those owners whose property is located outside of NEF Area 'C' would not ordinarily be entitled to recover because the jet noise in areas outside of NEF Area 'C' does not constitute normally a substantial interference with residential comfort, enjoyment and use of their property."

[9]A collection of commentaries critical of *Batten* may be found in Berger, *supra*, footnote 4, 9 Cal. Western L.Rev. at pages 236-238.

It should also be remembered that *Batten* is based on the Fifth Amendment of the United States Constitution, which is limited to a "taking" of property, whereas California, like Washington, has a broader provision referring to the "taking" or "damaging" of property. (*Martin* v. *Port of Seattle, supra,* 391 P.2d at p. 546; Cal. Const., art. I, § 14.)[10]

Finally, the adoption of Code of Civil Procedure section 1239.3, referring to "an area in which excessive noise, vibration, discomfort, inconvenience or interference with the use and enjoyment of real property located adjacent to or in the vicinity of an airport," impliedly rejects any requirement of direct overflights. (*City of Oakland* v. *Nutter, supra,* 13 Cal.App.3d 752, 766.)

### Substantial Damage

■   The City contends that plaintiffs did not prove there was damage to the property in a substantial amount. (*Lombardy* v. *Peter Kiewit Sons' Co.,* 266 Cal.App.2d 599, 602-603 [72 Cal.Rptr. 240], app. dism., 394 U.S. 813 [22 L.Ed.2d 748, 89 S.Ct. 1486], overruled on another ground, *Southern Cal. Edison Co.* v. *Bourgerie,* 9 Cal.3d 169, 175 [107 Cal.Rptr. 76, 507 P.2d 964].) However, *Lombardy* was a case which was decided upon the pleadings alone, in which the plaintiffs merely claimed to have sustained damages to real property *and person* in the amount of $5,000, and therefore it was impossible to tell to what extent the property itself was damaged.

In this case, however, the trial court found that the noise from the jet aircraft severely and substantially interfered with the residential use and enjoyment of the properties and found measurable reductions in market value in the amounts indicated in the judgment. Whether the damage was substantial enough to be compensable is a mixed question of fact and law for the trial court to determine, and the court's implied findings on factual issues will be upheld on appeal if there is substantial evidence to support them. (*Riverside County Flood etc. Dist.* v. *Halman, supra,* 262 Cal.App. 2d 510, 517.) In the absence of specific legislative standards (see Van Alstyne, *supra,* fn. 5, 16 U.C.L.A. L.Rev. at pp. 535-539) we cannot say the damage was insubstantial in this case.

---

[10]Although we reject the application of strict notions of trespass to the instant case, it may be noted that there is precedent for liability for damage caused by vibrations emitted through the air or the ground. (E.g., *Smith* v. *Lockheed Propulsion Co.,* 247 Cal.App.2d 774, 784 [56 Cal.Rptr. 128, 29 A.L.R.3d 538]; *McGrath* v. *Basich Brothers Const. Co.,* 7 Cal.App.2d 573, 576 [46 P.2d 981].)

## *Proximate Cause*

■ The City contends that it should not be liable because it does not build or fly the jet aircraft which make the noise and therefore the City's conduct is not the proximate cause of plaintiffs' damage. (*Albers* v. *County of Los Angeles,* 62 Cal.2d 250, 263 [42 Cal.Rptr. 89, 398 P.2d 129].) This argument is without merit. The fact that the City plans, builds and operates the airport is sufficient to impose liability. (*Griggs* v. *Allegheny County, supra,* 369 U.S. 84, 89 [7 L.Ed.2d 585, 589].) The City's operation of the airport need not be the sole cause of the damage. It need only be one substantial cause. (*Holtz* v. *Superior Court, supra,* 3 Cal.3d 296, 304, fn. 9; *Blau* v. *City of Los Angeles,* 32 Cal.App.3d 77, 84-85 [107 Cal.Rptr. 727].)

## *Federal Pre-emption: Navigable Air Space*

■ The City contends that because Congress has declared a public freedom of transit through the navigable air space, and has defined navigable air space to include air space needed to insure safety in takeoff and landing (49 U.S.C.A. §§ 1301, 1304) the City is immune from liability. This is also without merit. The fact that the flights are within the navigable air space does not immunize the owner and operator of an airport for failure to appropriate the land and air space necessary to provide an adequate approach way. (*Griggs* v. *Allegheny County, supra,* 369 U.S. 84, 88 [7 L.Ed.2d 585, 588]; *Loma Portal Civic Club* v. *American Airlines, Inc., supra,* 61 Cal.2d 582, 591-594; *City of Oakland* v. *Nutter, supra,* 13 Cal.App.3d 752, 763, fn. 12; *Martin* v. *Port of Seattle, supra,* 391 P.2d 540, 544-545; *Thornburg* v. *Port of Portland, supra,* 376 P.2d 100, 108.)[11]

## *Federal Pre-emption: Noise Control*

■ The City contends that the extensive pattern of federal regulation of air transportation pre-empts the field and that "[s]ince it is the Federal Government which controls the airspace it should be their responsibility for what happens as a result of its use." The contention that federal pre-

---

[11]City attempts to distinguish *Griggs* on the ground that the fact situation there arose prior to the 1958 amendment defining navigable air space to include the air space necessary to insure safe takeoff and landing. This is not persuasive. Even prior to 1958 the air space necessary to insure safe takeoff and landing was controlled by federal regulations. (*Allegheny Airlines* v. *Village of Cedarhurst* (2d Cir. 1956) 238 F.2d 812, 815; *City of Newark, New Jersey* v. *Eastern Airlines* (D.N.J. 1958) 159 F.Supp. 750, 756.) The flights in *Griggs* were not in violation of any CAA regulations, yet relief against the county as owner and operator of the airport was granted. (*Loma Portal Civic Club* v. *American Airlines, Inc., supra,* at p. 594.) The question is considered settled by the authorities cited in the text.

emption precluded all state activity in aircraft noise control was rejected by our Supreme Court in *Loma Portal Civic Club* v. *American Airlines, Inc., supra,* at pages 591-594. The court found that the maintenance of an action for damages by the property owners, such as this one, would not conflict with federal law. The court said: "Moreover, we note that noise abatement is a federal as well as a state aim, and when not inconsistent with safety, the enforcement of a damage remedy under a nuisance theory, for example, would not necessarily present a conflict with federal law but might well reinforce it. . . . [¶] Only a compelling federal interest, e.g., where the state-created liability would clearly frustrate federal purposes, justifies our implying an intent on the part of Congress to nullify common-law rights normally in the state-law sphere." *(Id.,* at p. 592.)

The City relies on *Allegheny Airlines* v. *Village of Cedarhurst* (2d Cir. 1956) *supra,* 238 F.2d 812, affg. (E.D.N.Y. 1955) 132 F.Supp. 871; and *City of Newark, New Jersey* v. *Eastern Airlines* (D.N.J. 1958) *supra,* 159 F.Supp. 750, cases in which municipal ordinances attempting to regulate the altitude at which aircraft flew over the city were invalidated. As noted in *Loma Portal Civic Club, supra,* at pages 593-594, in both of those cases there was a direct conflict with federal flight control and the courts expressly stated that their decision did not affect the right of property owners to sue for damages.

In *American Airlines, Inc.* v. *Town of Hempstead* (2d Cir. 1968) 398 F.2d 369, affg. (E.D.N.Y. 1967) 272 F.Supp. 226, cert. den., 393 U.S. 1017 [21 L.Ed.2d 561, 89 S.Ct. 620], the court struck down a municipal ordinance which prohibited the operation of any mechanism which created a noise within the town exceedng a certain level. The court invalidated the ordinance on the ground there was a direct conflict with federal regulations controlling flight patterns and procedures because it was impossible to comply with the ordinance without changing altitudes, flight paths, traffic patterns, and safety margins regulated by the federal government. But the court noted that the case had nothing to do with the question of land-owners' rights to compensation for overflights which constituted a taking of property. (398 F.2d at p. 372.)

In *City of Burbank* v. *Lockheed Air Terminal* (1973) 411 U.S. 624 [36 L.Ed.2d 547, 93 S.Ct. 1854], the Supreme Court invalidated a municipal ordinance which prohibited pure jet landings and takeoffs from Hollywood-Burbank Airport between 11 .p.m. and 7 a.m. The ordinance was invalidated because such curfews, if enacted upon a widespread basis, would result in bunching of flights which would be inconsistent with the federal regulatory scheme. *(Id.,* at pp. 627, 639-640 [36 L.Ed.2d at pp.

550, 557].) The majority opinion went further, however, to declare that section 611 of the Federal Aviation Act, as amended by the Noise Control Act of 1972 (49 U.S.C.A. § 1431) impliedly pre-empted the field of aircraft noise control. (*Id.*, at pp. 628-640 [36 L.Ed.2d at pp. 551-557].)

Nothing in *Burbank* or *Hempstead* suggests, however, that the City of Los Angeles, as owner and operator of LAX, should be absolved of all responsibility for the substantial interference with plaintiffs' use and enjoyment of their property which results from use of the airport. The legislative history of section 611 expressly indicates that it is not intended to "affect the rights of a State or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport."[12]

---

[12]This language is that of the Secretary of Transportation quoted in the Senate Report on the bill adding section 611 to the Federal Aviation Act. In more detail the report states as follows: "The bill is an amendment to a statute describing the powers and duties of the Federal Government with respect to air commerce. As indicated earlier in this report, certain actions by State and local public agencies, such as zoning to assure compatible land use, are a necessary part of the total attack on aircraft noise. In this connection, the question is raised whether this bill adds or subtracts anything from the powers of State or local governments. It is not the intent of the committee in recommending this legislation to effect any change in the existing apportionment of powers between the Federal and State and local governments.

"In this regard, we concur in the following views set forth by the Secretary in his letter to the committee of June 22, 1968: 'The courts have held that the Federal Government presently preempts the field of noise regulation insofar as it involves controlling the flight of aircraft. Local noise control legislation limiting the permissible noise level of all overflying aircraft has recently been struck down because it conflicted with Federal regulation of air traffic. American Airlines v. Town of Hempstead. 272 F.Supp. 226 (U.S.D.C., E.D., N.Y., 1966). The court said, at 231, "The legislation operates in an area committed to Federal care, and noise limiting rules operating as do those of the ordinance must come from a Federal source." H.R. 3400 would merely expand the Federal Government's role in a field already preempted. It would not change this preemption. State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft.

'However, the proposed legislation will not affect the rights of a State or local public agency, as the proprietor of an airport, from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory.

'Just as an airport owner is responsible for deciding how long the runways will be, so is the owner responsible for obtaining noise easements necessary to permit the landing and takeoff of the aircraft. The Federal Government is in no position to require an airport to accept service by larger aircraft and, for that purpose, to obtain longer runways. Likewise, the Federal Government is in no position to require an airport to accept service by noisier aircraft, and for that purpose to obtain additional

In neither *Burbank* nor *Hempstead* was the municipality which enacted the invalid ordinance the owner and operator of the airport which the offending aircraft were using. This was noted in *Burbank,* where the court expressly avoided decision as to the powers of a municipality as proprietor of the airport.[13] Likewise the town of Hempstead was not the owner and operator of JFK International Airport in New York. The difference between the power of the town of Hempstead and the power of the Port of New York Authority was noted by the trial court in *Hempstead. (American Airlines, Inc.* v. *Town of Hempstead* (E.D.N.Y. 1967) *supra,* 272 F.Supp. 226, 233.) In *Port of New York Authority* v. *Eastern Air Lines, Inc.* (E.D.N.Y. 1966) 259 F.Supp. 745, the court upheld the power of the port authority to enforce its own rules and regulations limiting the use of a certain runway in part to abate noise in the community of Jackson Heights.

California law recognizes that a city as owner and operator of an airport has power to make reasonable rules regulating the use of the airport. (Gov. Code, § 50474; *Stagg* v. *Municipal Court,* 2 Cal.App.3d 318, 322 [82 Cal.Rptr. 578].) California has adopted extensive regulations for the control of noise by airport proprietors. (Pub. Util. Code, § 21669; Cal. Admin. Code, tit. 4, §§ 5000-5080.5; Comment, *We May Yet Have a Quiet Environment: The New California Airport Noise Regulations* (1972) 12 Santa Clara Law. 79; Vittek, *supra,* fn. 4 at pp. 509-514.)

---

noise easements. The issue is the service desired by the airport owner and the steps it is willing to take to obtain the service. In dealing with this issue, the Federal Government should not substitute its judgment for that of the States or elements of local government who, for the most part, own and operate our Nation's airports. The proposed legislation is not designed to do this and will not prevent airport proprietors from excluding any aircraft on the basis of noise considerations.'

"Of course, the authority of units of local government to control the effects of aircraft noise through the exercise of land use planning and zoning powers is not diminished by the bill.

"Finally, since the flight of aircraft has been preempted by the Federal Government, State and local governments can presently exercise no control over sonic boom. The bill makes no change in this regard." (Sen.Rep. No. 1353, 90th Cong. 2d Sess. (1968) 2 U.S. Code Cong. & Admin. News (1968) pp. 2693-2694.)

[13]". . . But, we are concerned here not with an ordinance imposed by the City of Burbank as 'proprietor' of the airport, but with the exercise of police power. While the Hollywood-Burbank Airport may be the only major airport which is privately owned, many airports are owned by one municipality yet physically located in another. For example, the principal airport serving Cincinnati is located in Kentucky. Thus, authority that a municipality may have as a landlord is not necessarily congruent with its police power. We do not consider here what limits, if any, apply to a municipality as a proprietor." (*City of Burbank* v. *Lockheed Air Terminal, supra,* 411 U.S. at p. 636, fn. 14 [36 L.Ed.2d at p. 555, fn. 14].)

There is no issue in this proceeding as to the validity of California's noise standards or of any rule or regulation adopted by the City as proprietor of the airport. We mention these matters only to suggest that the City is not powerless to take steps to alleviate the problem of jet noise. Indeed, over the years since the problem was brought to the City's attention it has taken several constructive steps to attempt to ease this burden. Obviously a final solution to the problem will require numerous different approaches to it and the cooperation of airplane manufacturers, the airlines, federal, state and local government.[14] Although many parties other than the City may have helped to create the problem, the City's role as planner, owner and operator of the airport is sufficient to require it to compensate the plaintiffs in this case. (*Griggs* v. *Allegheny County, supra,* 369 U.S. 84, 89-90 [7 L.Ed.2d 585, 589].)[15]

*Statute of Limitations*

■ The City contends that plaintiffs did not timely file claims within one year from the time the cause of action arose. (Gov. Code, § 911.2; *Mosesian* v. *County of Fresno,* 28 Cal.App.3d 493, 495 [104 Cal.Rptr. 655].) The claims were filed in January and February of 1964. The City contends that the cause of action arose sometime in 1962 and therefore the claims were not timely. The trial court determined that for purposes of Government Code section 911.2 the cause of action arose in May 1963 and thus the statute was satisfied.

The question of when a cause of action arises in a case such as this is a difficult one and the answer necessarily depends upon a number of factors. In *Jensen* v. *United States* (1962) 305 F.2d 444, 447 [158 Ct.Cl. 333], the court stated, "There is, unfortunately, no simple litmus test for discovering in all cases when an avigation easement is first taken by overflights. Some annoyance must be borne without compensation [citations]. The point when that stage is passed depends on a particularized judgment evaluating such factors as the frequency and level of the flights; the type of planes; the accompanying effects, such as noise or falling objects; the uses of the property; the effect on values; the reasonable reactions of the

[14]For one discussion of the multiple strategies available to attack the problem of jet noise see Comment, *supra,* footnote 2, 6 Harv. Civ. Rights-Civ. Lib. L.Rev. 61. See also Larsen, *Improving the Airport Environment: Effect of the 1969 FAA Regulations on Noise* (1970) 55 Iowa L.Rev. 808.

[15]The record in the instant case does not present the issue as to whether the City has any cause of action against any other parties such as the airlines, aircraft manufacturers, or the federal government.

humans below; and the impact upon animals and vegetable life." The determination necessarily depends upon the facts of each case.

The City points to certain evidence that individual plaintiffs were annoyed by the jet noise in 1962 and that they hired attorneys and appraisers in that year. But the cause of action did not accrue at the point the homeowners first became annoyed. As pointed out in *Jensen* some annoyance must be borne without compensation. It is only when the flights substantially interfered with the use and enjoyment of plaintiffs' properties and resulted in a diminution of their market value that a cause of action arose. (*Aaron* v. *United States* (1963) 311 F.2d 798, 800 [160 Ct.Cl. 295], second appeal (1964) 340 F.2d 655, 658-659 [167 Ct.Cl. 818].)

Moreover, under the decision in *Pierpont Inn, Inc.* v. *State of California,* 70 Cal.2d 282, 291-293 [74 Cal.Rptr. 521, 449 P.2d 737], which relies in turn upon *United States* v. *Dickinson* (1947) 331 U.S. 745, 747-749 [91 L.Ed. 1789, 1793-1794, 67 S.Ct. 1382], plaintiffs were not required to sue as soon as the damaging flights began but were entitled to some extent to wait until the situation became stabilized. (See also *Nestle* v. *City of Santa Monica, supra,* 6 Cal.3d 920, 937.)

In the instant case, the trial court carefully weighed a variety of circumstances including the increase in the number of jet aircraft landings, the increase in the number of fan jet aircraft (which are greatly more annoying than pure jet aircraft), and the effect upon the residents, and determined that the statute of limitations began to run in May 1963. Many of the individual plaintiffs testified that although they were annoyed by the noise in 1962, the frequency of the flights and the damage caused by the noise jumped markedly in 1963. (See *Jensen* v. *United States, supra.*) There was substantial evidence to support the trial court's ruling that plaintiffs' claims were timely filed.

Since we uphold the trial court's finding that for purposes of the statute of limitations the taking or damaging of plaintiffs' property occurred as of May 1963, there is no merit to the City's contention that the testimony of plaintiffs' appraisers was defective in failing to distinguish decreases in market value which the City contends occurred in 1962. (See *Pierpont Inn, Inc.* v. *State of California, supra,* 70 Cal.2d 282, 290-294.)[16]

---

[16] Another contention raised by the City as to the appraisal testimony is that it should have been stricken as based on speculation. This contention is based on a single remark of one appraiser which he later corrected. There were many days of testimony by the appraisers explaining the reasons for their opinions. The trial court properly denied the motion to strike. (*MCA, Inc.* v. *Universal Diversified Enterprises Corp.,* 27 Cal.App.3d 170, 178-179 [103 Cal.Rptr. 522].)

### *Admissibility of NEF Area Study*

██ The City argues that the trial court should have excluded from evidence the Bolt, Beranek and Newman study of noise exposure forecast areas for LAX, because the earliest portion of that study was for the year 1965, whereas the taking or damaging in the instant case occurred in May 1963. The City contends that the study was therefore irrelevant. This argument is without merit. The NEF area contours were based upon a number of factors including frequency of jet flights, timing of such flights by day and by night, types of jet aircraft, operating conditions and procedures, and flight patterns. Although the number of flights increased between 1963 and 1965, the City points to no evidence that the types of aircraft, operating procedures, or flight patterns were substantially different in 1965. That NEF area C was the neighborhood of the most severe impact on land use was substantiated by the testimony of the appraisers. The trial court took the date of the study into account in determining the weight of the evidence. The study was relevant. (Evid. Code, § 210.)

### III

#### CONCLUSION

██ In summary we hold that the municipal operator of an airport is liable for a taking or damaging of property when the owner of property in the vicinity of the airport can show a measurable reduction in market value resulting from the operation of the airport in such manner that the noise from aircraft using the airport causes a substantial interference with the use and enjoyment of the property, and the interference is sufficiently direct and sufficiently peculiar that the owner, if uncompensated, would pay more than his proper share to the public undertaking. Whether the interference is substantial enough to meet this standard is a mixed question of fact and law for the trial judge to determine. The owner need not prove there were direct overflights of the property. The fact that the federal government controls the flight of aircraft does not relieve the airport owner and operator of liability where the operation of the airport is a substantial cause of the property owner's damage.

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 28, 1974.