[Civ. No. 43765. Second Dist., Div. Three. Dec. 18, 1974.]

ROBERT S. PARKER et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant.

558

COUNSEL

Burt Pines, City Attorney, Milton N. Sherman, Chief Assistant City Attorney, John F. Haggerty, Assistant City Attorney, James H. Pearson and Ronald J. Einboden, Deputy City Attorneys, for Defendant and Appellant.

William F. Powers and John J. Schimmenti for Plaintiffs and Respondents.

OPINION

COBEY, J.—Defendant, City of Los Angeles, appeals from a judgment, filed March 8, 1973, awarding to the owners of certain residential properties the sum of $224,370.77 in damages in inverse condemnation. The city also appeals from a minute order of March 27, 1973 denying its motion to strike plaintiffs' cost bill and to tax costs. Both appeals lie. (Code Civ. Proc., § 904.1, subds. (a), (b).)

The award under appeal consists of $160,301 in principal amount and $64,109.37 in interest. To this the trial court has added costs of $79,875.76 composed primarily of attorneys' fees in the amount of $74,646.76 and appraisal fees of $4,775. The gross award is $304,286.13.

This sum is in payment for an avigation easement over, near and around the various properties of plaintiffs, and is in payment as well for the diminution in the fair market values of their properties by reason of the noise and vibration from jet aircraft using the north runway complex of the Los Angeles International Airport.

The city generally contends that the trial court abused its discretion in

denying the city's motion for judgment pursuant to Code of Civil Procedure, section 631.8; that plaintiffs' expert evidence in support of the damages awarded was inadmissible, and, in any event, the evidence in support of the damages awarded is insubstantial; that the amount of damages awarded was excessive and should have been allocated between two takings; that the conditional alternative allocations between two takings made by the trial court is unsupported by substantial evidence; that neither prejudgment interest nor attorneys' fees and appraisal fees should have been awarded; and finally, that the amount of attorneys' fees awarded was excessive.[1]

## FACTS

Los Angeles International Airport contains four parallel runways. Two of these are located north of the terminal area. To aircraft approaching the airport for landing from the east, or departing the airport to the west, the runways north of the terminal are designated 24L and 24R. They constitute the north runway complex.

On or about June 23, 1967, unrestricted flights, using runway 24L for all types of jet aircraft, commenced. The use of that runway for this purpose since that date has been continuous except for normal interruptions required by periodic maintenance.

On or about June 29, 1970, runway 24R was open for regular use by jet aircraft. Under the city's preferential usage system, 83 percent of daily landings and takeoffs of jet aircraft have been, are and will be on and from 24L; the remaining 17 percent use and will use 24R.

Between June 23, 1967 and January 1, 1971, there were, on the

---

[1]Attorneys' and appraisal fees were awarded pursuant to Code of Civil Procedure, section 1246.3. This section was added by Statutes 1971, chapter 1574, page 3154, section 1. In pertinent part it has always read as follows: "In any inverse condemnation proceeding brought for the taking of any interest in real property, the court rendering judgment for the plaintiff by awarding compensation for such taking . . . shall determine and award . . . to such plaintiff, as a part of such judgment . . . such sum as will, in the opinion of the court . . . reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding."

In setting forth the city's contentions on appeal, we have omitted the following ones: (1) the damage award was prejudicially erroneous because certain of the properties·of the plaintiffs were not subject to overflight; (2) the responsibility for the control of jet noise belongs to the federal government; and (3) the city should not be held liable for policy reasons. We are not going to discuss these contentions because all of them were rejected in the recent case of *Aaron v. City of Los Angeles,* 40 Cal.App.3d 471, 484-489, 493 [115 Cal.Rptr. 162].

average, a minimum of approximately 200 takeoffs and landings of jet aircraft daily from and to the north runway complex. The city's forecasts indicate that this use of these runways by jet aircraft will continue.

Aircraft landing on runways 24L and 24R fly directly over the properties of four of the plaintiffs, including the largest property, at heights of approximately 250 to 300 feet. Aircraft taking off from these runways go by six of plaintiffs' properties approximately 1,300 to 4,000 feet to the south of them at heights ranging from approximately zero to 500 feet.

Jet aircraft, consisting primarily of heavy carriers, taking off from and landing on these runways create substantial noise perceptible to people on the ground at plaintiffs' properties. This noise constitutes a substantial interference with plaintiffs' use and enjoyment of their properties. Since June 23, 1967, flights of jet aircraft to or from these runways over or near to plaintiffs' properties has caused, by reason of the noise and vibration from such flights, substantial damage to the fair market values of their properties.

## DISCUSSION

*Denial of 631.8 Motion.*

The city first contends that the trial court abused its discretion in denying the city's motion for judgment made pursuant to Code of Civil Procedure, section 631.8, at the close of the plaintiffs' case in chief on two grounds—(1) on the basis of the expert evidence no substantial damage had been done to the four multiple residential properties because, according to plaintiffs' evidence, three of them had increased in value, and (2) the comparable sales used by plaintiffs' expert witness in valuing the single family residential properties were quite generally of higher priced homes than the corresponding subject properties.

 Neither of these grounds has merit. In regard to the multiple residential properties (apartment houses), plaintiffs' expert witness, John Williams, also testified that the increase that had occurred in their values would have been significantly greater but for the adverse effect of the noise and vibration of jet aircraft. Similarly, plaintiffs' expert witness on the damages to the single family residential properties, Norman Mason, explained that he had selected his comparable sales from that part of Westchester which was unaffected by noise and vibration from the jet aircraft using the airport. This seems to us to have been a reasonable step

in ascertaining the diminution in fair market values of the affected properties occasioned by the use by jet aircraft of the north runway complex of the airport. We note in this connection that the city's expert witness on damages, Robert Flavel, used the same approach of affected and unaffected areas in arriving at his opinions as to the amounts of damages plaintiffs had suffered.

*The Damages Awarded Were Proper.*

The city attacks the testimony and other evidence of plaintiffs' expert witnesses on damages on the basis that their opinions regarding such damages were based on inadmissible evidence. The city also contends that the damage awards themselves are both excessive and rest upon insubstantial evidence.

Our review of the record indicates otherwise. ■ The opinions of the two expert witnesses on damages for plaintiffs, namely, the afore-mentioned John Williams and Norman Mason, were not based on any inadmissible evidence. (See Evid. Code, §§ 814, 816, 818-822.) John Williams, the plaintiffs' expert witness on damages to the fair market values of apartment house properties, based his opinions on a comparison of the values of apartment houses under the flight pattern with those outside of it. He detailed what happened to the fair market values of the subject multiple residential properties following the date of taking, June 23, 1967. He explained that he had chosen the rental income capitalization approach to fair market value (Evid. Code, § 819) because this was the approach that buyers and sellers in the market place rely upon most heavily when valuing income-producing properties such as apartment houses. Williams did use, though, in arriving at his opinions regarding the extent of the damages to the fair market values of the various multiple residential subject properties an assumed normal annual rental increase rate of 4½ percent and likewise an assumed annual average vacancy rate of 3 percent. These assumed rates were based largely upon the experience of comparably sized apartment houses, located, however, in Santa Monica near the ocean. As the trial court observed, these apartment houses were not, by reason of their location, particularly comparable to the multiple residential subject properties. That may well be the reason why the trial court awarded damages substantially below those testified to by Williams.

Norman Mason, plaintiffs' expert witness on damages to the fair market values of the single-family residential properties, had been an active real estate broker in the Westchester area of Los Angeles for well

over 25 years at the time of trial. He knew from his brokerage experience that the noise, etc. from the operation of jet aircraft to and from the Los Angeles International Airport had substantial adverse effect upon property values in only a part of Westchester. He therefore based his opinions of the damages done to the fair market values of the subject properties, as to which he testified, upon a comparison of the fair market values of comparable properties within the area of Westchester affected by the jet aircraft noise, etc. with those of properties located outside the affected area. Again, however, the trial court did not accept Mason's opinions regarding the extent of damages done to these fair market values of the subject properties. Its awards were substantially less.

In addition to this expert evidence on damages offered by and through Williams and Mason, the trial court heard owners of the subject properties, together with a few neighbors, testify in some detail on the specific adverse effects upon living conditions on their properties occasioned by the takeoffs and landings of jet aircraft on the north runway complex of the airport.

Finally, the testimony of Bert Lockwood, the assistant manager of the city's department of airports, together with the totals of air-carrier movement inbound to and outbound from the airport for the calendar years of 1967 through 1970, furnished substantial evidentiary support for the trial court's findings that between June 23, 1967 and January 1, 1971 there were on the average a minimum of approximately 200 takeoffs and landings of jet aircraft daily from and to the north runway complex of the airport and that this frequency of use of the complex by jet aircraft will continue. There can be no doubt from the record before us that jet aircraft, particularly heavy air carriers, caused substantial interference with the use and enjoyment of plaintiffs' properties and that this interference was sufficiently direct and sufficiently peculiar that the owners thereof, if uncompensated, would pay more than their proper share of the cost of the operation of the Los Angeles International Airport. (Cf. *Aaron v. City of Los Angeles, supra,* 40 Cal.App.3d 471, 493.)

*The Refusal to Allocate Damages.*

According to the pretrial orders there were two takings by the city—the first on June 23, 1967 when unrestricted use of runway 24L commenced and the second on June 29, 1970 when runway 24R was open for use. The city contends that the trial court should, therefore, have allocated its damage awards between these two takings as the

expert witnesses generally did. The city further attacks the trial court's suggested allocation of its damage awards (if the same is required by law) of 83 percent to the first taking and 17 percent to the second in cases of properties subject to overflight and 50 percent otherwise to each taking. The trial court obviously based its suggested overflight allocation of damages on the proportionate usage of the two runways, as Williams, plaintiffs' expert witness on damages to the fair market values of the multiple residential properties, also did, and its other allocation of damages on the expert opinion of Mason that damages should be divided equally between the takings. Mason, however, gave no reasons for this arbitrary allocation of damages, and we perceive none.

■ But we do not think that the law requires that the damages be allocated in this case. They were allocated generally by the three expert witnesses on damages apparently solely because they were so instructed. Robert Flavell, the city's sole expert witness on damages, testified that during the first year of the operation of runway 24R, on the average, there were less than 27 aircraft movements daily from and to the runway. Consequently, in his expert opinion, the difference in adverse effect upon the largest property involved between the operation of runway 24L and the operation of runway 24R was the difference between a blow by a sledge hammer to one's finger and a subsequent tap by a pencil upon the already injured finger.

It seems to us that the adverse effect upon the fair market values of the subject properties, which the operation of runway 24R (commencing on June 29, 1970) had, may well have been minimal. In any event, it was the continuation of the comparatively heavy daily use of runway 24L that did the bulk of the damage even after June 29, 1970. Furthermore, following that date, the damage to the fair market values of the subject properties was caused by the use of both runways rather than by the use of runway 24R alone. Under these circumstances it would be exalting form over substance to say that there were two takings by the city and therefore two sets of damages to each property.[2] Consequently the trial court was correct in finding but one taking—that of June 23, 1967—and but one set of damages for each property.

*The Award of Prejudgment Interest Was Proper.*

■ It has long been established in California that it is proper to

---

[2] A different set of claims and complaints were apparently filed for each alleged taking. This may have been done through an abundance of caution and to make certain that whatever damages arose from the operation of runway 24R might be included in any award made in this action.

award prejudgment interest in inverse condemnation actions. (See Civ. Code, § 3287, subd. (a); *Heimann* v. *City of Los Angeles,* 30 Cal.2d 746, 758-760 [185 P.2d 597], overruled on another point, 48 Cal.2d 672, 679 [312 P.2d 680]; *Youngblood* v. *Los Angeles County Flood Control Dist.,* 56 Cal.2d 603, 611-612 [15 Cal.Rptr. 904, 364 P.2d 840].) ▮ Such an award is a part of the just compensation granted by the Constitution and runs from the date of injury (see *Heimann, supra*), which was in this case June 23, 1967, when unrestricted use of runway 24L by jet aircraft commenced.

The city contends that since the damage to the fair market values of the subject properties was not instantaneous but accrued over a period of years, interest should not have been awarded from June 23, 1967. The trouble with this position is that there is nothing in the record before us that would establish a more appropriate date for the commencement of damages than June 23, 1967. This being the case it was proper to award prejudgment interest from June 23, 1967.[3]

*The Award of Attorneys' Fees and Appraisal Fees as Costs Was Proper.*

The city challenges the award of attorneys' fees and appraisal fees on three grounds: (1) the cost bill incorporating them was filed prematurely and the city duly moved to strike it; (2) the statute authorizing such an award for the first time (Code Civ. Proc., § 1246.3) should not be applied in this case where the taking (June 23, 1967), the filing of the inverse condemnation actions (1970), and much of the legal services by plaintiffs' attorneys all antedated the date when the section became mandatory—that is, July 1, 1972 (see Stats. 1971, ch. 1574, § 30, subd. (b), p. 3164); (3) the award of attorneys' fees was excessive and unreasonable.

It is true that plaintiffs filed their cost bill prematurely. Code of Civil Procedure, section 1033, specifies that a cost bill must be filed "at any time after the verdict or decision of the court, and not later than 10 days after the entry of the judgment." Plaintiffs filed their cost bill on March

---

[3]The city also contends that the trial court should have offset against its award of prejudgment interest the value to plaintiffs of their continued possession of their properties following the "taking" thereof by the city on June 23, 1967. This contention is without merit. The taking involved here was not a dispossession of plaintiffs. It was instead a continuing injury to the fair market values of their properties. Their remaining in possession of their properties in no way diminished the injury for which damages were awarded.

We have found nothing in either the language or legislative history of Code of Civil Procedure section 1255b, subdivision (b), indicating the Legislature intended this subsection to apply to nondispossession cases in inverse condemnation.

1, 1973. The trial court's decision (its findings of fact and conclusions of law—see *Martin Sch. of Aviation* v. *Bank of America,* 48 Cal.2d 689, 695 [312 P.2d 251]) was not filed until March 8, 1973.

█ This error, however, is not fatal. It was a mere irregularity and not jurisdictional. It did not render the cost bill itself a nullity. (See *Pioneer Title Ins. Co.* v. *Guttman,* 175 Cal.App.2d 116, 121-122 [345 P.2d 577].) The city suffered no prejudice by reason of it. Consequently, it cannot rise to the stature of reversible error. (See Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

In determining whether section 1246.3 applies to a pending action such as the one before us, we look first to legislative intent. We have examined the legislative history of the bill (AB 533 (1971 Reg. Sess.)) which contains the section and found nothing therein regarding legislative intent on the point at issue. The section was apparently enacted to satisfy certain requirements for federal assistance. (See Leg. Counsel Opn., 5 Sen. J. (1971 Reg. Sess.) pp. 8256-8257; Comment, *Relocation Assistance in California* (1972) 3 Pacific L.J. 114, 138-139.)

█ It seems clear, though, from the language of the section (see fn. 1) that any attorneys' fees and appraisal fees awarded in inverse condemnation actions pursuant to it must be awarded as "costs" since they are awarded as a part of the judgment and in reimbursement for "reasonable costs, disbursements and expenses." A judgment for monetary damages together with prejudgment interest such as this one is made up of three parts: (1) the damage award; (2) the prejudgment interest; and (3) costs. Obviously any attorneys' fees and appraisal fees awarded must be awarded as "costs" since they do not fit into either of the other two categories of items included within the judgment. This conclusion is also borne out by Code of Civil Procedure, section 1021, which is included within the chapter on costs and makes reference therein to the fact that "Except as attorney's fees are specifically provided for by statute" the measure and mode of compensation of attorneys is left to the agreement of the parties.

As just indicated, costs are allowed only when authorized by statute. █ Their allowance therefore depends on the provisions of the statute on fees *at the time of the accrual of the right to have them taxed.* (*Stockton Theatres, Inc.* v. *Palermo,* 47 Cal.2d 469, 477 [304 P.2d 7]; *Hogan* v. *Ingold,* 38 Cal.2d 802, 814 [243 P.2d 1, 32 A.L.R.2d 834]; see also *Turner* v. *East Side Canal & Irr. Co.,* 177 Cal. 570, 571 [171 P. 299], overruled on another point, 8 Cal.3d 792, 796-797 [106 Cal.Rptr. 169, 505

P.2d 1009]; *Begbie* v. *Begbie,* 128 Cal. 154, 155 [60 P. 667]; *Coast Bank* v. *Holmes,* 19 Cal.App.3d 581, 594 [97 Cal.Rptr. 30].[4])

This leaves only the question of the reasonableness of the attorneys' fees awarded—one-third of the actual damages awarded plus the prejudgment interest thereon. In other words, in this case plaintiffs' attorneys were awarded from the city one-third of the just compensation awarded their clients.

■ In considering this question, we first note that a contingent-fee type of compensation rather than a quantum meruit one appears appropriate since under the statute a plaintiff becomes entitled to reasonable attorney's fees only if he prevails in the inverse condemnation action. We note secondly that, unlike an eminent domain proceeding where normally the sole issue is the amount of the property owner's damages, in an inverse condemnation action the plaintiff has the burden of first establishing his legal right to any damages *at all* from the public entity. It therefore generally is a more risky type of litigation for property owners than eminent domain proceedings.

In this case expert evidence was received that the predominant form of fee arrangement in inverse condemnation actions in Los Angeles for professional services rendered at the trial level was one-third of the recovery and that the contingent fee arrangement in this kind of action differed from the normal contingent fee contract in an eminent domain proceeding in that in the latter situation the attorney received one-third of the difference between the amount awarded and the last offer of the public entity prior to the attorney's employment. The trial court was also advised by declarations of the experience and specialized expertise of plaintiffs' two attorneys. It also was able to make its own appraisal of their professional competence by observing the manner in which they tried these actions.

■ Whether a particular attorney's fee is reasonable is a matter resting within the sound discretion of the trial court. (See *State of California* v. *Westover Co.,* 140 Cal.App.2d 447, 449 [295 P.2d 96].) We cannot say on the record before us that the trial court abused its

---

[4]We note further that an award of attorney's fees authorized by a statute enacted while the action was pending has been upheld on the basis that the change in law was a procedural one only and therefore not violative of the general policy against statutory retroactivity. (See *Olson* v. *Hickman,* 25 Cal.App.3d 920, 922 [102 Cal.Rptr. 248].)

Similarly an increase in probate fees on the estates of decedents who died before the statute authorizing the increase became effective has been held to be procedural only and as not involving the imposition of a new or additional burden on such estates. (*Estate of Johnston,* 47 Cal.2d 265, 272 [303 P.2d 1].)

discretion in awarding the fees it did in this case. They appear to us to have been reasonable under the circumstances.

## DISPOSITION

The judgment and the order under appeal are both affirmed.

Allport, Ácting P. J., and Potter, J., concurred.

A petition for a rehearing was denied January 15, 1975, and the opinion was modified to read as printed above.