[No. B027345. Second Dist., Div. Four. Mar. 28, 1990.]

ERNEST MARSHALL et al., Plaintiffs and Appellants, v. DEPARTMENT OF WATER AND POWER OF THE CITY OF LOS ANGELES, Defendant and Appellant.

1128

COUNSEL

Pat K. Bowen, Cummins & White, Marshall W. Vorkink and Kent M. Bridwell for Plaintiffs and Appellants.

James K. Hahn, City Attorney, Edward C. Farrell, Assistant City Attorney, and Roberta Scharlin Zinman, Deputy City Attorney, for Defendant and Appellant.

OPINION

GOERTZEN, J.—After the 1981 Chatsworth fire, several property owners and insurance companies filed suits against the Department of Water and Power of the City of Los Angeles (DWP) and the City of Los Angeles.[1] Pursuant to written stipulation, the actions were consolidated. Included in the various causes of action was one for inverse condemnation. With the exception of the inverse condemnation cause of action, the matter was tried to a jury, which found for DWP and against the plaintiffs. Simultaneously, the inverse condemnation cause of action was tried to the court, which found for the plaintiffs. A second jury was impaneled to determine the amount of damages to be awarded to the plaintiffs. The court awarded varying amounts of attorney fees.

The DWP appeals, contending that substantial evidence is lacking; that the trial court erred when it refused to allow a jury trial on the issue of causation and when it impaneled a second jury to determine the amount of damages. We reject each of these contentions.

The Ransbottom Limited Partnership (Ransbottom) and Ernest and Nelda Marshall (the Marshalls) appeal. Together they assert that the compensation awarded by the jury was inadequate as a matter of law, and prejudgment interest should have been included in the calculation of attorney fees. The Marshalls additionally argue that the court awarded inadequate attorney fees and request that we award attorney fees on appeal.[2] With the exception of the Marshalls' contention related to the adequacy of the attorney fees award, we also reject these assertions of error.

---

[1] Subsequently, the City of Los Angeles was dismissed as a defendant.

[2] Initially 12 plaintiffs appealed. After reaching settlement of their claims, 10 of these appeals have been dismissed.

## UNDERLYING FACTS

*Plaintiffs' Case.* The Chatsworth fire broke out at approximately 11 a.m. on October 31, 1981. It started in a field near the intersection of Plummer Avenue and Rudnick Avenue.

A series of power poles were located along the northerly edge of Plummer Avenue, including two poles near Rudnick Avenue which were designated 12-West and 13-East, respectively. Those poles were spaced approximately 160 feet apart and each supported 3 primary conductors (wires) which were designed to carry 4,800 volts of electricity. Those wires were part of a power distribution circuit, the purpose of which was to provide electricity to consumers in the northwest section of Los Angeles City. This public improvement was undertaken by DWP, a governmental agency.

Angela Rasmussen and her three children witnessed the fire because they were tending their horses, which were corralled on the property adjacent to where the fire started. The day was windy, very dry and hot. Mrs. Rasmussen heard a zapping sound in the area of Plummer and Rudnick and within 10 to 15 seconds heard her daughter yell, "Fire!" Ms. Rasmussen immediately ran to get the water hose and, when she reached the hose, noticed that the power lines were down and jumping in the street. She saw white, blue, and yellow sparks coming from the wires. The fire was located inside the fence of the adjacent property, running parallel to Plummer Avenue. After the fire was underway, Ms. Rasmussen noticed marks on the pavement made by the downed electrical wires. The fire went across the open field and up the hill. Immediately prior to the fire starting, Ms. Rasmussen did not see anyone either in the open field or in the surrounding area.

Erik Rasmussen was 10 years old at the time of the fire. He was grooming his horse when he heard a loud booming sound. He looked toward the sound, and saw a wire down in the street. Two wires were jumping around in the street and sparking. After he heard his sister yell "Fire," Erik looked back to where the wires were. They were no longer both in the street; one was inside the field, next to the fire. When he first saw the fire, it was just starting and was a circle of about three feet in diameter. The wire was inside the circle of fire. Erik did not see the spark that set the fire. He attempted to smother the fire by shoveling dirt on it.

Monique Rasmussen was 14 years old on the day of the fire. As she was grooming her horse, she heard a big boom or snapping sound coming from behind her. She turned and saw the wires over Plummer Street had broken and were down in the street. Within 15 seconds she saw the fire on the adjacent property. Monique estimated the fire to be about five feet in

diameter when she first saw it. She noticed that the winds made the wires move, causing them to create a noise, and that the wires would occasionally spark when hitting the ground. Monique never saw a power line in the street showering sparks across into a grassy field. She attempted to fight the fire by shoveling dirt on it.

Several residents of the area heard the sounds made by the downed wires, saw the wires sparking, and witnessed the fire.

Captain Bruce Frashure of the Los Angeles City Fire Department was in command of the first fire engine to arrive at the scene. At that time, he had been employed by the fire department for 12 years, working mostly in fire suppression. Upon arrival at the fire, he noticed "a hot wire down in the street." He also observed burn marks on the pavement. "It appeared that the wires had arced in the street and left . . . the mark on the asphalt." He recalled seeing one mark that "resembled a snake going across Plummer from what appeared to be a hot wire" toward the place where the fire had started. Based upon his observations, Captain Frashure believed that the fire had originated near the corral fence at Plummer and Rudnick, in the brush about five to ten feet from the edge of the roadway surface on Plummer.

At two different times that day, Captain Frashure examined the area to determine where the fire had started. On both occasions, he searched for possible sources of fireworks, flammable liquids, incendiary devices or "anything that could possibly ignite a fire." He found none. Finding no source of ignition and hearing no one describe any suspicious activity, Captain Frashure made the initial determination that the fire probably had been caused by the arcing wires. This remained his opinion at the trial.

With regard to flammable liquids, Captain Frashure "kicked up the dirt looking for every possibility of moist spots underneath the area" and also used his nose. He explained, "[i]f they had used incendiary flammable liquids in the area, I am pretty sure I would be able to smell it." Based on his experience, Captain Frashure opined that the fire's origin, within a five-foot radius, was near the corral at Plummer and Rudnick, placing it off the pavement and in the grassy area. He also determined that the broken power line was long enough to reach into the area.

Cyrillis W. Holms, Jr., is a private fire investigator with substantial experience in his field. He was retained by Cummins & White, the law firm representing the insurance plaintiffs, to conduct an investigation of the Chatsworth Fire. He personally examined the scene on two occasions, taking photographs, checking for burn patterns, and identifying the structure

which had been consumed in the fire. He began walking along Plummer and worked his way back and forth across the field.

At about 30 or 40 locations, he got down and looked for "burn indicators." These are minor obstructions, such as dirt clods, cans, fence posts, or other objects, which tend to protect adjacent material from the advancing flames. These create a "shadow" effect or difference of heat intensity, thereby leaving telltale evidence of the fire's direction.

Mr. Holms identified and interviewed several witnesses, including residents of the fire area and the Rasmussen family. In addition, he reviewed the transcript of Captain Frashure's deposition, as well as the report of the Fire Department arson investigator.

Based upon his investigation and prior experience, Mr. Holms concluded that the fire "was a direct result of the downed power lines generating the heat to cause ignition of the grass." In his opinion, it did not make any difference whether the heat had been caused by sparking or arcing. He noted that either end of the broken power line could have produced an electrical arc. He opined that the fire had originated in the northeast corner of the field, spreading west and south from there.

William Cass was employed as an arson investigator for the Los Angeles City Fire Department and was assigned to investigate the Chatsworth fire of October 31, 1981. At the time of trial, he had investigated in excess of 2,300 fires for cause and origin. On November 3, 1981, he and his partner examined the scene. They walked through the area, looking for possible sources of ignition. They examined the probable area of origin, walked back to the base of the hill, and found no possible sources of ignition.

Investigator Cass observed some apparent burn or scorch marks within two distinct areas of the pavement on Plummer Avenue. With the use of a measuring tape, he further determined that the broken wire from pole 12-West was long enough to reach into the adjacent field where the fire had apparently started. He also interviewed two witnesses. Based upon these inquiries, Inspector Cass formed the opinion that "a downed power line had started the fire."

When he was called to testify at trial, Inspector Cass had changed his opinion. He testified that the fire had been deliberately set by one Douglas Ray Mordue (Mordue).[3] In July 1986, his office received information that

---

[3] Until Inspector Cass's testimony, the plaintiffs did not know of the existence of Mordue. The court asked the DWP counsel when DWP had first learned about Mordue and was informed that DWP knew of him since September 25, 1986, almost two years before trial. DWP did not believe it had a duty to disclose the existence of Mr. Mordue to the plaintiffs. The court was not in accord.

Mordue, who was then serving a prison sentence for forgery, had written a letter to the Secret Service, admitting that he had set various fires, including the Chatsworth fire.

Investigator Cass interviewed Mordue in prison on two occasions. Mordue confessed to having set the Chatsworth brushfire. However, Cass was skeptical about the truth of Mordue's claims because some of Mordue's statements proved to be false, and his story changed between the first and second interviews. At times, Investigator Cass doubted Mordue's truth and veracity. Nonetheless, he believed Mordue with respect to the Chatsworth fire because of his "detailed information" and his "familiarity with the area and the terrain." However, Mordue's family home was in nearby Canoga Park, south of the Chatsworth Reservoir. Apparently, Mordue had attended both church and school in the area and had lived there for approximately 18 years. Mordue previously worked at a location due east of where the fire occurred.

During the course of his confessions, Mordue repeatedly expressed a desire to remain in an institutional setting. Investigator Cass believed Mordue was telling him about the fires to "make sure he stayed within the prison system." Mordue confessed to Investigator Cass that he had falsely confessed to brushfires in the past. He also described himself as a "paranoid schizophrenic," and he reportedly heard "voices."

Douglas Mordue was called as a witness. According to his testimony, he set four fires in the brush area near Plummer on October 31, 1981. During his earlier confession, Mordue had mentioned setting five different fires. He claimed to have set four separate fires along the base of the hill then walked down and started the fifth at a point close to the corral, using gasoline each time. At trial, Mordue testified that he used a special "chemical" that he had obtained from a friend. Unlike every other percipient witness, Mordue described the wind on that day as not very strong. Originally, Mordue had told Investigator Cass that he had been accompanied by a Luke Decinso when he set the fires. He also told a friend about having helped to save his grandmother's house from the fire. Investigator Cass eventually determined that no person named Luke Decinso actually existed, and that Mordue's grandmother did not live in the vicinity of the fire.

Frank D'Andrea, a resident of Rudnick Avenue on the day of the fire, lived across the street from where the fire started. He had a panoramic view of the fire scene. Other than the one fire near his home, Mr. D'Andrea did not see any smoke or fires at any other location.

Steven Lang lived next door to Mordue on the day of the fire. He had known Mordue for about 18 years and was familiar with Mordue's reputation for not telling the truth. According to Mr. Lang, "[Mordue] likes to tell tall tales."

Mordue's mother described Mordue as a "pathological liar" and testified that he had been diagnosed as such by a doctor.

*DWP Defense.* Benjamin Renfro, a retired fireman with over 30 years experience, was hired by DWP to investigate the fire scene. After visiting the location and interviewing witnesses, he was unable to form an opinion as to the exact point where the fire started. He opined that the cause was incendiary and not related to the downed wires.

Lee Lawhead, a DWP employee, testified about the behavior of the downed wires, concluding that it was unrealistic and not in conformance with physical evidence to conclude that the wire from pole 12-West could have come down in the field in the grassy area. Based on tests that Mr. Lawhead had performed, he opined that it was not possible that sparks created at the subject site could have caused a fire.

Patrick McGuiness, a self-employed fire consultant who had been a fire fighter for 23 years, was hired by DWP. In July 1985, he began his investigation. He read reports, interviewed witnesses, listened to fire department tapes to check time sequences, and formed the opinion that there was more than one area of origin of the fire.

Dr. Cheng, a 12-year employee of the University of Southern California electrical engineering department, was retained by DWP in July 1985. He testified about the effect of gravity upon the direction in which pole wires would fall. He opined that it was not possible for the wire to have reached beyond the fence to the field, nor did he believe that the wire from a 4,800-volt line could create a fire or that the temperature from a spark would be hot enough to create a fire.

As a consequence of the fire, real and personal property was destroyed. A more complete description of these losses will be included below in the discussion of the plaintiffs' appeals.

### PROCEDURAL HISTORY

As noted above, two separate actions were filed against DWP. The first complaint, filed on September 13, 1982, was a joint pleading on behalf of, among others, the Marshalls and Ransbottom. In addition to specified

actual damages, each of the plaintiffs sought to recover prejudgment interest, costs of suit and, with respect to the inverse condemnation, litigation expenses including attorney fees. The second action commenced on April 13, 1983.

After consolidation, the complaint alleged causes of action for "dangerous condition" under the Tort Claims Act; product liability; inverse condemnation; dangerous condition, failure to discharge mandatory duties; nuisance; and "public employee or independent contractor."

On October 14, 1986, several plaintiffs filed a motion to sever the inverse condemnation matter from all other issues. The motion was denied. On October 23, 1986, DWP requested a jury trial on the issue of proximate causation during the inverse condemnation trial. The court denied this request.

On October 14, 1986, the trial began. A jury was impaneled to hear the issues relating to the tort causes of action while the court heard the inverse condemnation cause of action.

On October 31, 1986, after presentation of evidence and argument, outside the presence of the jury, the court ruled against DWP on the issue of the inverse condemnation.[4]

---

[4]In making its ruling, the court commented as follows: "[Counsel], you say that this is a case of coincidences. I think it would have to be the most incredible coincidence for this fire to have started at Plummer and Rudnick at that corral near downed power lines that was [sic] sparking and arcing, leaving arc marks that were seen in the field for it to have been caused by any other source than those downed power lines. [¶] It is not just wires down and the conclusion, then, that wires started the fire, as you suggest, but, in fact, it is wires down, it is a fire, and an investigation that concludes that there is no other cause of that fire. [¶] This court concludes that the plaintiffs have proved their case by the preponderance of the evidence. I am satisfied that the fire, in fact, began at the point of origin—or area origin [which] was the southeast [sic] corner of the field adjacent to the corral and that the fire was caused by electrical sparks emanating from the downed power lines owned and maintained by the Department of Water and Power. The fire then spread due to the prevailing wind conditions. [¶] The plaintiffs have satisfied me from their evidence that the fire started from those downed power lines. Three persons who were closest to the fire were the three Rasmussens. Although Mrs. Rasmussen indicated . . . she saw—first saw the fire 41 feet inside the field, her daughter Monique, who was the first person to see the fire, testified that the fire started 10 feet from the field. Whether it is 10 or 41, I don't think is that terribly significant. I believe that Erik Rasmussen was telling the truth when he said he saw the wire go into the field. [¶] Dr. Cheng did not convince me that it was impossible for that to happen. I thought his [Erik's] testimony was credible. There was absolutely no reason for him to make that up. [¶] As I indicated to you earlier, what D'Andrea saw, what Mrs. Nottoli saw, and what Mr. Soltis saw are not inconsistent with the Rasmussens, but rather they saw the fire and the activity of the wires sometime after the fire had begun. Immediately after Captain Frashure arrived, who was the first expert to arrive on the scene, he also indicated that the area of origin of the fire was in the southeast [sic] corner of the field, that he saw the downed power lines on the

The trial continued on the issue of dangerous condition. The jury returned a verdict in favor of DWP. After the jurors had been polled, they were informed that a second phase of the trial was scheduled to commence on the issue of damages on the inverse condemnation action. The court inquired if the jurors would be available to sit during the second phase; they responded negatively. The jury was dismissed without objection.

The second phase of trial commenced and a new jury was impaneled. In pertinent part, the jury awarded $1 in damages to the Marshalls. The jury also awarded $1 to Ransbottom, which by means of additur was increased to $100,001 after he moved for a new trial.

In response to the various memoranda submitted for awards of costs and attorney fees, the court refused to include prejudgment interest as part of the judgment when it calculated the amount of attorney fees. In pertinent part, the court awarded Ransbottom attorney fees in an amount representing 25 percent of the judgment and the Marshalls attorney fees in an amount representing 30 percent of the judgment.[5]

---

south side of the street. [¶] . . . . [¶] Northeast corner of the field. . . . [¶] I just made a mistake. . . . [¶] His testimony was that he made an investigation and his investigation was not a casual investigation. He investigated that entire area, could find no other source of or cause of the fire. [¶] . . . . [¶] Cass also immediately investigated the fire, it was within days, and he also concluded that the fire was caused by the downed power lines. His opinion did not change for some five years, until he interviewed Mr. Mordue. And, as I indicated before, he relied on Mr. Mordue's confession for the following reasons: One, Mordue was familiar with the area. Two, he presented a knowledge of the weather conditions, although his knowledge, at least in court, was inconsistent with what I think is true, and that is that there was heavy winds that day. He [Cass] also was impressed that he had specific knowledge of the distance between houses, that he knew the dairy was open and that he had knowledge of the location and types of fences around the area of Plummer and Rudnick. [¶] All of that can be explained by the fact that Mr. Mordue lived in the area and, in fact, went to school near this area and apparently passed it often. [¶] As I indicated, his testimony is inherently incredible. . . . [¶] And there is certainly testimony from his mother that he is not a truthful person. [¶] His demeanor was not truthful. He was inconsistent with what he had told Mr. Cass, and I think he's lying. [¶] . . . . [¶] The experts' opinion as to the cause of the fire, I am impressed with the people that were there immediately following the fire, and it seems to me that it could not have come from any other source but those downed power lines."

[5] In pertinent part, the order awarding prejudgment interest and attorney fees provided: "With respect to attorneys' fees, the plaintiffs have requested the court to award fees pursuant to C.C.P. § 1036, based on either their hourly rate, as applied to actual hours spent, or upon their contingency fee contract, as applied to the damages awarded by the jury, plus prejudgment interest. Each set of plaintiffs filed with the court, and the court has considered, for each plaintiff, one or more declarations setting forth the following information: [¶] 1. The number of hours actually expended by each lawyer and others at his law firm, [¶] 2. The reasonable hourly rate normally charged by said attorneys, [¶] 3. The novelty and difficulty of the issues involved in this case, [¶] 4. The skill and experience of each attorney, [¶] 5. The extent to which working on this litigation precluded other employment by the attorney, [¶] 6. The terms of the contingent fee arrangement between each attorney and his client(s), and; [¶] 7. The result obtained by the attorney. [¶] In addition, the court considered the fact that three

## The DWP Appeal

### Issues on Appeal

DWP contends that: (1) the trial court erred when it denied DWP's request for a jury trial on the issue of causation on the inverse condemnation cause of action; (2) substantial evidence is lacking to support the court's determination that the fire was started by the downed power lines; and (3) it was error to impanel a second jury to decide the issue of damages. We reject each of these assertions of error and affirm the judgment against DWP.

### Discussion

We begin with a brief overview of applicable law. ■ An action for inverse condemnation "is an eminent domain proceeding initiated by the property owner rather than the condemner. The principles which affect the parties' rights in an inverse condemnation suit are the same as those in an eminent domain action. [Citations.]" (*Breidert* v. *Southern Pac. Co.* (1964) 61 Cal.2d 659, 663, fn. 1 [39 Cal.Rptr. 903, 394 P.2d 719].) "The authority for prosecution of an inverse condemnation proceeding derives from article I, section 19, of the California Constitution." (*Holtz* v. *San Francisco Bay Area Rapid Transit Dist.* (1976) 17 Cal.3d 648, 652 [131 Cal.Rptr. 646, 552 P.2d 430].)[6] The doctrine has been summarized as follows: "Article I, section 19 (formerly art. I, § 14) of the California Constitution requires that just compensation be paid when private property is taken or damaged for public use. Therefore, a public entity may be liable in an inverse condemnation action for any physical injury to real property proximately caused by a public improvement as deliberately designed and constructed, whether or not that injury was foreseeable, and in the absence of fault by the public entity. [Citations.]" (*Souza* v. *Silver Development Co.* (1985) 164 Cal.App.3d 165, 170 [210 Cal.Rptr. 146].)

Although historically stated in terms of real property, inverse condemnation also has been extended to compensate for the loss of personal property. (*Aetna Life & Casualty Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 865, 877-878 [216 Cal.Rptr. 831].) ■ The primary question is whether

---

days of the trial did not involve the issue of inverse condemnation. [¶] . . . . [¶] Plaintiffs are not entitled to have the percentage of attorneys' fee awarded herein applied to the amount of prejudgment interest awarded herein. Such an award would result in an enormous and inequitable windfall to the attorneys."

 [6] In pertinent part, article I, section 19, provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner."

there has been a "taking" in terms of property damage, destruction, depreciation in market value, or dispossession of the owner. (*Olson* v. *County of Shasta* (1970) 5 Cal.App.3d 336, 341 [85 Cal.Rptr. 77].) This includes losses due to fire. (*Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d at pp. 873-874.) Any governmental entity may be liable for inverse condemnation, even agencies which lack eminent domain authority. (*Baker* v. *Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862, 866-867 [218 Cal.Rptr. 293, 705 P.2d 866], cert. den. (1986) 475 U.S. 1017 [89 L.Ed.2d 314, 106 S.Ct. 1200].)

In order to establish an actionable "taking," the plaintiff must demonstrate a causal relationship between governmental activity and the property loss complained of. (*Souza* v. *Silver Development Co., supra,* 164 Cal.App.3d at p. 171.) Typically, this element is referred to as "proximate cause." Unlike the corresponding element in negligence cases, however, foreseeability is not a consideration for inverse condemnation. Instead, a governmental entity may be held strictly liable, irrespective of fault, where a public improvement constitutes a substantial cause of the plaintiff's damages even if only one of several concurrent causes. (*Belair* v. *Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 558-559 [253 Cal.Rptr. 693, 764 P.2d 1070].)

With this summary as background, we turn to the issues before us.

1. *Jury Trial and Issue of Causation.* As noted in footnote 6, *ante,* article I, section 19, of the California Constitution provides that in an eminent domain proceeding the just compensation to be awarded is "ascertained by a jury unless waived." Either party has right to demand a jury trial on the ultimate issue of "just compensation."

Eminent domain proceedings often present issues of fact in addition to the question of whether there has been a "taking." (See *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 964 [218 Cal.Rptr. 839].) ■ The role of a jury and the court in an eminent domain proceeding where issues of fact arise was explained in *People* v. *Ricciardi* (1943) 23 Cal.2d 390, 402 [144 P.2d 799], as follows: "When the proceeding comes on for hearing all issues except the sole issue relating to compensation, are to be tried by the court, and if the court does not make special findings on those issues its findings thereon are implicit in the verdict awarding compensation. [Citations.] . . . . 'It is only the "compensation," the "award," which our constitution declares shall be found and fixed by a jury. *All other questions of fact, or of mixed fact and law, are to be tried, . . . without reference to a jury.* [Citation.]' " (Italics added.)

The right to a jury trial on the issue of compensation applies as well in an inverse condemnation proceeding. (*Highland Realty Co.* v. *City of San Rafael* (1956) 46 Cal.2d 669, 683 [298 P.2d 15].) Various cases have held that where determination of liability involves a mixed question of law and fact, the "Eminent Domain Rule" applies, and the only issue to be determined by the jury is compensation. (*Orpheum Bldg. Co.* v. *San Francisco Bay Area Rapid Transit Dist.* (1978) 80 Cal.App.3d 863, 868 [146 Cal.Rptr. 5].)

■ The question presented by this appeal is: In an inverse condemnation proceeding where liability is completely a factual question, does the plaintiff have a right to a jury trial on the issue of liability? We answer, "No."

DWP objects, arguing that while causation is never an issue in eminent domain proceedings, it is the critical question in this inverse condemnation proceeding; that the eminent domain legal question, "Is there a taking?," differs from the factual inverse condemnation question, "What caused the fire?" This difference, DWP insists, mandates a jury trial. We acknowledge that the questions are distinct but cannot accept the result which DWP proposes. A myriad of cases exists where the trial court has decided other factual issues arising in eminent domain and inverse condemnation proceedings. (See, e.g., *People* v. *Ricciardi, supra,* 23 Cal.2d 390; *Belair* v. *Riverside County Flood Control Dist., supra,* 47 Cal.3d 550; *Redevelopment Agency* v. *Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73 [185 Cal.Rptr. 159]; *Orpheum Bldg. Co.* v. *San Francisco Bay Area Rapid Transit Dist., supra,* 80 Cal.App.3d 863.)

The rule was succinctly stated in *Redevelopment Agency* v. *Tobriner* (1984) 153 Cal.App.3d 367, 376 [200 Cal.Rptr. 364], certiorari denied (1984) 469 U.S. 882 [83 L.Ed.2d 187, 105 S.Ct. 250]: "The determination of whether an inverse taking has occurred is a nonjury question, *even when there are factual questions involved.* [Citation.]" (Italics added.) Nothing DWP argues convinces us that this rule should not apply even when the factual issue is causation. Time and again, our trial courts act capably and fairly as triers of fact.

We are aware of several inverse condemnation cases where the jury was allowed to determine factual issues other than compensation. (See, e.g., *Tri-Chem, Inc.* v. *Los Angeles County Flood Control Dist.* (1976) 60 Cal.App.3d 306 [132 Cal.Rptr. 142]; *Stone* v. *City of Los Angeles* (1975) 51 Cal.App.3d 987 [124 Cal.Rptr. 822].) Pointing to *Stone,* DWP contends that the appellate court specifically approved of this procedure. Our reading of the *Stone* case does not lead us to the same conclusion. The *Stone* court did not

directly discuss the propriety of the trial court submitting factual issues, other than compensation, to the jury. Instead, the procedure seems to have been accepted as a fait accompli, and the court proceeded to address the admissibility of certain evidence and whether certain considerations were taken into account. The court's silence does not support the giant step proposed by DWP, that is, a holding that a plaintiff has a *right* to a jury determination of factual issues other than compensation.

We hold that in an inverse condemnation proceeding, the parties have a right to a jury trial solely on the issue of compensation. All other determinations related to the inverse taking, whether purely factual or a mixture of factual and legal, are nonjury questions. If the trial court is so inclined and the parties agree, or if the parties so stipulate and the court agrees, other factual issues may be submitted to the jury. (See discussion in *Orpheum Bldg. Co.* v. *San Francisco Bay Area Rapid Transit Dist., supra,* 80 Cal.App.3d at p. 868.)

Our holding is further supported by the general rule that absent a specific statutory or constitutional requirement for a jury trial, there is no such right in a special proceeding. (*Taliaferro* v. *Hoogs* (1965) 236 Cal.App.2d 521, 529 [46 Cal.Rptr. 147].) The doctrine of inverse condemnation is derived from the constitution and is a special proceeding, implemented by specific statutory regulations. (*County of San Diego* v. *Miller* (1980) 102 Cal.App.3d 424, 432-433 [162 Cal.Rptr. 480].)

*2. Substantial Evidence.* In propounding its contention that substantial evidence is lacking to support the trial court's conclusion that the downed power lines caused the fire, DWP focuses solely on evidence which it presented in defense. The rules on appeal render this focus totally inappropriate.

■ "In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment. [Citation.] All issues of credibility are likewise within the province of the trier of fact. [Citation.] 'In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.*' [Citation.] All conflicts, therefore, must be resolved in favor of the respondent. [Citation.]" (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480], italics in original.) ■ Without repeating it all, we conclude that the evidence summarized above provides the requisite substantial evidence to support the court's determination that the downed, arcing wires started the fire.

3. *Impaneling the Second Jury.* DWP asserts that the same jury panel which heard the first phase of the trial should have been retained to hear evidence on the issue of compensation/damages.

As noted above, the original jury was impaneled to determine the issue of liability for "dangerous condition." It returned a verdict in favor of the DWP on that issue. Afterwards, the trial court asked if those jurors would be available to remain for the second phase of the trial. The record indicates a negative response; consequently, the jury was discharged.

We fail to see what prejudice, if any, DWP suffered. Bifurcation is a common and appropriate practice in inverse condemnation trials. (*Redevelopment Agency* v. *Contra Costa Theatre, Inc., supra*, 135 Cal.App.3d at p. 80.) Were it not for the fact that there was a negligence cause of action to be tried, there would not have been a jury present during the liability phase of this inverse condemnation proceeding. Normally, a "fresh" jury would have been selected to fix the proper amount of compensation in any event, which is exactly what occurred here. There was no error.

### Ransbottom and Marshall Appeal

#### Issues on Appeal

On appeal, Ransbottom and the Marshalls assert that the compensation awarded was inadequate as a matter of law and that prejudgment interest should have been included in the calculation of the award of attorney fees. The Marshalls further assert that the trial court awarded inadequate attorney fees and request that we award attorney fees on appeal.

#### Facts Related to Damages

*The Ransbottom Property.* Jack G. Ransbottom is a builder and developer and has been in the construction business for 30 years. Over approximately a nine-month period, he had purchased six lots, totalling fifty-eight acres, in the fire area. He planned to subdivide the parcel into 70 separate lots, 24 for horsekeeping and 46 as "estates." There were several homes on the property at the time of the fire. The fire destroyed 50 percent of the property, including trees and homes.

With regard to the 9435 Shoup Avenue property losses, Mr. Ransbottom testified as follows: residence replacement—$277,682; cost of landscaping—$168,924, with the oak trees valued at $39,747; metal horse stable value—$3,500; wood fencing value—$4,080 and 1,500 feet of burned barbed wire value—$2.50 a lineal foot; office fixtures stored in the house value—

$11,500; personal property and furnishings estimate value—$5,000. The total amount claimed for this property was $520,183. Mr. Ransbottom had received a $100,000 policy limit payment from his insurance company.

With regard to the 22350 Plummer Street property, Mr. Ransbottom testified as follows: no replacement cost as the building did not burn down; smoke damage—$3,500, of which $1811.80 was paid by his insurance company; landscaping cost—$64,788; damage to the oak trees—$22,670; 1540 feet of burned barbed wire value—$2.50 a lineal foot. The total net damage was $92,996.20.

With regard to the 22506 Plummer Street property, the only claim was for $12,551 for damage to oak trees.

With regard to the 22522 Plummer Street property, the only damage was to oak trees in the amount of $23,970.

The value of the raw land before the fire was valued by Mr. Ransbottom at $6 million.

James Shanahan, a consulting arborist, worked for the DWP from 1946 until his retirement in 1980. He had previously been called upon to testify as to the value of trees. In December of 1981, Mr. Ransbottom contacted Mr. Shanahan and asked him to evaluate the trees on his property. Mr. Shanahan formulated a list showing salvageable and damaged trees. The estimate to the damage to all the trees on the Shoup property was $102,338. The value of the trees lost at 22350 Plummer was $38,231. As to the 22522 Plummer location, the value of the trees lost was $36,210, and as to the 22506 Plummer property, the fire loss was estimated at $12,551.

On cross-examination, Mr. Shanahan admitted that he had presumed the trees to be healthy because he had not received information to the contrary. Based on new information, he adjusted some of the values downward.[7]

Efraim Donity, a landscape consultant and horticultural and irrigation consultant, was hired by Mr. Ransbottom to evaluate damages to landscaping and houses after the fire. He did not include the evaluation of damaged oak trees in his study. As to the 9435 Shoup Avenue property, he estimated $300 to prune back damaged bushes, $60,000 to replace three acres of shrubbery, and miscellaneous charges, all of which totalled $151,174. On 22350 Plummer property, he estimated a total of $61,358.

---

[7] The value figures related above reflect this adjustment.

At the time of the fire, Roger Rudenbush lived in the guest house at 9435 Shoup and served as a caretaker for the property. He had noticed that office furniture, such as desks, chairs and typewriters, and lumber were stored in the main residence.

*The Marshalls' Property.* On the day of the fire, the Marshalls lived at 22719 Michale Street, Canoga Park. Their home was burned down to the foundation, and all of their personal property was destroyed. A workshop and its contents were also destroyed as were trees and other landscaping. The Marshalls had lived in their home less than one year prior to the fire. The Marshalls' insurance company paid the cost of rebuilding their residence and their excess living expenses. This figure totalled $213,529. They testified to uninsured losses totalling $165,728.59.

On cross-examination, Mr. Marshall stated that the house which was destroyed was about 1,800 square feet and included 3 bedrooms, 2½ baths, a living room, a dining room, kitchen, service porch and garage. He claimed to have lost hundreds of books, which he valued at $10,000.

Mrs. Marshall owned several collections, including silver spoons, stamps (valued at $500), coins (valued at $500), thimbles (valued at $350), and antique napkin holder rings (valued at $500). After the fire, she attempted to locate her jewelry, but it was either lost or found in pieces. Pieces of the 100-piece spoon collection were also found in the ashes. She estimated their losses, over and above the insurance, at $165,728.59.

On cross-examination, Mrs. Marshall testified that she had purchased the living room furniture in 1980, prior to moving into the house. The furniture had an estimated value of $11,500. She could not recall where she had purchased the furniture or if it came from more than one store. She probably paid for it both with cash and on credit. Mrs. Marshall estimated the value of the dining room furniture at $10,700. She purchased it in 1979 but could not recall where or how much she had paid for it. The family room furniture, purchased in 1977 at an unknown location, was estimated at $8,000. Mrs. Marshall could not recall if she paid cash or charged it. She estimated the television room furnishings to be valued at $8,500, the guest bedroom furnishing at $6,900, and the master bedroom furnishings at $8,800. Mrs. Marshall had prepared an extensive list of items lost in the kitchen, including $250 for "kitchen gadgets" and $200 for vitamins. She valued a loss of over 300 records at $3,410. She also claimed to have lost 50 pairs of shoes.

Chris Verhaegh, a professional numismatist (rare coin dealer), appraised some French 20-franc gold coins which were like those claimed as lost by

the Marshalls. A less valuable coin had a "melt" value of $150. In 1981, the catalog value of the coins was from $150 to $175 each.

DWP presented no affirmative defense as to the value of the property loss suffered either by Ransbottom or the Marshalls.

The Marshalls' motion for a directed verdict was denied as was their motion for a new trial.

## DISCUSSION

*Adequacy of the Compensation Award.* According to the uncontradicted evidence adduced at trial, Ransbottom suffered losses totalling $549,700. The jury awarded Ransbottom $1, which by means of additur was increased to $100,001. According to the uncontradicted evidence adduced at trial, the Marshalls suffered losses totalling $168,299. The Marshalls were awarded $1, and their motion for a new trial was denied. Both Ransbottom and the Marshalls argue that their respective damage awards are inadequate as a matter of law. Alternatively, they assert that prejudicial instructional error occurred when the court, sua sponte, modified an instruction.

The question presented by this appeal is: In an inverse condemnation proceeding, when the government agency has presented no counter valuation evidence, is a jury free to disbelieve a plaintiff's valuation testimony and award compensation in an amount less than the losses testified to by the plaintiff?

Both Ransbottom and the Marshalls cite cases which hold that in an inverse condemnation action, the promise of "just compensation" is constitutional in origin; the usual measure of just compensation is the fair market value of the real or personal property taken, which is generally defined as the highest dollar price which the property "would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of all of the uses and purposes to which it was adapted and for which it was capable." (*Sacramento etc. R.R. Co.* v. *Heilbron* (1909) 156 Cal. 408, 409 [104 P. 979]; see also *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 303-304 [90 Cal.Rptr. 345, 475 P.2d 441]; *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 43 [104 Cal.Rptr. 1, 500 P.2d 1345].) No one disputes the validity of these holdings.

Disagreement ensues with the next part of the argument. Ransbottom and the Marshalls further contend that in an inverse condemnation suit, the plaintiff sets the ceiling of compensation and the government agency, through the presentation of counter evidence, sets the floor. Here, they

assert, the government agency failed to set the floor because it presented no affirmative evidence about the value of the property lost; consequently, the jury could do nothing but award them the amount of losses to which they testified. To support this proposition, Ransbottom and the Marshalls, among other cases, cite *Aetna Life & Casualty Co.* v. *City of Los Angeles, supra,* 170 Cal.App.3d 865.

The *Aetna* case involved a suit brought by property owners and their respective insurance companies against the DWP for property losses suffered as a consequence of the 1978 Mandeville Canyon fire. (170 Cal.App.3d at p. 872.) After the DWP failed to present affirmative evidence on valuation, the trial court granted the plaintiffs' motion for directed verdict. Among other things, on appeal DWP argued that the granting of the motion was erroneous. Writing for division 2 of this court, Justice Compton reiterated the rule governing the granting of a motion for a directed verdict[8] and affirmed the trial court's action, stating: "A jury hearing a condemnation action may not disregard the evidence as to value and render a verdict which either exceeds or falls below the limits established by the testimony of the witnesses. [Citations.] The trier of fact in an [inverse condemnation] action is not an appraiser, and does not make a determination of market value based on its opinion thereof. Instead it determines the market value of the property, based on the opinions of the valuation witnesses. [Citation.] [¶] . . . [¶] Any deviation from the evidence by the jury would have been improper." (*Id.*, at pp. 877-878.) The *Aetna* court did not discuss credibility as it apparently was not an issue.

In support of their assertion that a jury cannot disregard the valuation testimony presented at trial, Ransbottom and the Marshalls also cite *County of Los Angeles* v. *Kling* (1972) 22 Cal.App.3d 916, 923 [99 Cal.Rptr. 642]; *Ventura County Flood Control Dist.* v. *Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1002 [93 Cal.Rptr. 653]; *Redevelopment Agency* v. *Modell* (1960) 177 Cal.App.2d 321, 326-327 [2 Cal.Rptr. 245]; and *People* ex rel. *D. of P. Wks.* v. *McCullough* (1950) 100 Cal.App.2d 101, 105 [223 P.2d 37].

The language in the *Aetna* case stressed by Ransbottom and the Marshalls was stated in the context of the granting of a motion for a directed verdict. Here, the court denied the Marshalls' motion for a directed verdict

---

[8] As stated by the *Aetna* court, the rule is: "A directed verdict is proper only when, after disregarding conflicting evidence and giving the opposing party's evidence every legitimate inference which may be drawn therefrom, there remains no evidence of sufficient substantiality to support a verdict in favor of the opposing party. [Citation.] Unless it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence and that any other holding would be so lacking in evidentiary support that a reviewing court would be compelled to reverse on appeal, or a trial court to set it aside, the trial court is not justified in taking the issue from the jury. [Citation.]" (*Id.*, at p. 876.)

and commented: "I think there is certainly enough examination of your clients to indicate that it is a triable issue of fact as to whether or not all their property was, in fact, in the house and the value of that property, and the motion is denied." In other words, the court could not make the required findings to support a directed verdict. (See fn. 8, *ante.*)

We do not argue with the validity of the rule defining the limits within which the jury must set compensation as stated in *Aetna* and the other cases cited. We point out, however, that as stressed by Ransbottom and the Marshalls, one part of the rule is missing. That is: the only evidence which the jury is not free to disregard is *competent evidence.* (*County of Los Angeles* v. *Kling, supra,* 22 Cal.App.3d at p. 923.) Moreover, "[w]here it appears that the opinion of a valuation witness is based upon considerations which are proper as well as those which are not, the testimony may be admitted and the *trier of fact shall determine its weight and credibility.* [Citation.]" (*Ventura County Flood Control Dist.* v. *Security First Nat. Bank, supra,* 15 Cal.App.3d at p. 1004, italics added.) Plainly stated, the trier of fact is not stripped of its role as the arbiter of a witness's credibility merely because the trial is one to set compensation in an inverse condemnation hearing. The jury must first determine whether or not the witness is credible and thereafter determine the weight to be given to the testimony. (*San Gabriel Valley Water Co.* v. *City of Montebello* (1978) 84 Cal.App.3d 757, 765.)

The jury was instructed that it could disregard the testimony of a witness that it did not believe. The DWP's failure to present affirmative evidence, in effect, set a floor of $0. By awarding the token $1, the jury was sending an unmistakable message—it did not believe the testimony either of Ransbottom or the Marshalls. When the court offered additur of $100,000 to Ransbottom and not the full amount testified to during trial, it was sending the same message.[9]

Alternatively, Ransbottom and the Marshalls argue that BAJI No. 11.80, modified by the court sua sponte, prejudicially confused the jury.[10] The court substituted the terms "real property" for the original

---

[9] Regarding the additur, the court offered the following reasons: "I am considering an additure [*sic*] for plaintiff Ransbottom in relationship to the house. [¶] I am considering an additure [*sic*] of a hundred thousand dollars. . . . [¶] I think he did lose something in the house. I think he has increased it somewhat. [¶] I am not prepared to make any findings that—for anything he presented regarding the landscaping, the stables, the fencing, the wire and the wood fencing. He didn't present enough evidence by a preponderance of the evidence to show me what the value of that was. [¶] But I think an additure [*sic*] for the residence of a hundred thousand dollars is appropriate, and I think there was enough evidence on the house alone. It's clear that the house was there and had gone. I am not sure about the fencing."

[10] BAJI No. 11.80, as modified, provides: "You must determine the fair market value of real property only from the opinions of the witnesses who have testified. [¶] You may not find

language, "subject property," because it believed that the instruction applied solely to real property. Ransbottom and the Marshalls argue that this alteration coupled with a failure to instruct on the difference between "real" property and "personal" property confused the jury into awarding $1 to each of them. We do not find that the trial record supports this contention.

To prevail on the basis of an alleged instructional error, a party must establish that but for the instructional error, a different result would have occurred. (Code Civ. Proc., § 475.) ▆▆▆ "In determining whether the probable effect of a jury instruction was to mislead the jury and was so prejudicial as to require reversal, we review all circumstances of the case, including the evidence and the other instructions given. There are no precise formulas to follow. [Citations.]" (*Maupin* v. *Widling* (1987) 192 Cal.App.3d 568, 572 [237 Cal.Rptr. 521].)

▆▆▆ One of the circumstances of this case which we find most telling is that the jury returned favorable verdicts for the other individual plaintiffs, some for the exact amount to which they testified.[11] The awards indicate that, independent of the alleged error, the jury understood and applied the correct criteria to compensate for real and personal property losses. In addition, even if the trial court improperly modified this instruction, the error was corrected by the remaining instructions where the term "property" was used. In defining just compensation, the court charged the jury that it included "reasonable compensation for property lost or destroyed in, or because of, the fire. That amount is the fair market value of such property at the time of its loss or destruction."

*Prejudgment Interest.* ▆▆▆ Both Ransbottom and the Marshalls contend that in awarding reasonable attorneys' fees on a percentage basis, the trial court should have taken prejudgment interest into account as part of the underlying recovery.

In pertinent part, Code of Civil Procedure section 1036 provides: "In any inverse condemnation proceeding brought for the taking of any interest in

---

the market value of property to be any less or more than that testified to by any witnesses. [¶] While owners and expert witnesses may express opinions on the issue of value, those opinions are worth no more than the reasons and factual data upon which they are based. [¶] Evidence has been received from witnesses of the reasons for their opinions of value, and all other evidence concerning the real property is to be considered only for the limited purpose of enabling [you] to understand and [weigh] the opinions of the witnesses regarding market value, if any. [¶] You must resolve any conflict in the testimony of the witnesses by weighing each opinion against the others, the reasons given for each opinion, the facts relied upon and the credibility and the qualifications of each witness."

[11] Other individual plaintiffs were awarded the following damages: Farrens—$78,000; Corliss—$39,652.15; Pincus—$81,186.67; Winners—$11,522; and Romero—$68,755.17.

real property, the court rendering judgment for the plaintiff by awarding compensation for such taking, . . . shall determine and award or allow to such plaintiff, as a part of such judgment . . . such sum as will, in the opinion of the court . . . reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding." When we review this exercise of the discretionary judgment of the trial court, the well-established principles dealing with discretion and its abuse apply. (*San Gabriel Valley Water Co.* v. *City of Montebello, supra*, 84 Cal.App.3d at p. 769.)

When ruling that it would not include prejudgment interest in the award of attorney fees, the court commented, "[The attorney fee award] will not include pre-judgment interest. It is an interesting issue that I wish you would take up on appeal, but it seems to me that the purpose of the pre-judgment interest is really to protect the private citizen against the taking of his or her property by the government, and really would result in an enourmous [*sic*] windfall to the attorneys, which I think would be inequitable." We are in accord with the court's view.

■■■ The underlying rationale for the award of prejudgment interest in an inverse condemnation setting was explained in *Aetna Life & Casualty Co.* v. *City of Los Angeles, supra*, 170 Cal.App.3d at pages 878-879: "The purpose of an award of prejudgment interest is to provide constitutionally mandated just compensation to persons whose property has been taken or damaged by the government. [Citation.] The right to prejudgment interest accrues on the date of the taking or damaging. [Citation.] [¶] . . . . [¶] If a government pays compensation to a property owner before or at the time property is taken or damaged, no interest is due. [Citation.] But if disbursement of the award is delayed, . . . the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the taking. [Citations.]"

These considerations are markedly different from those underlying an award of attorney fees. ■■■ As stated in *Holtz* v. *San Francisco Bay Area Rapid Transit Dist., supra*, 17 Cal.3d at page 658, the allowance of witness fees and attorney fees is not required by the just compensation clause of the California Constitution and is merely permitted by statute. The constitutional mandate to make whole a property owner does not translate into a basis for enriching an attorney fee award.

We are aware of *Parker* v. *City of Los Angeles* (1974) 44 Cal.App.3d 556 [118 Cal.Rptr. 687], where this court affirmed an attorney fee award which

was based upon a contingency fee agreement and included prejudgment interest in the calculation. The *Parker* court did not specifically discuss the propriety of including the prejudgment interest in the award and based its affirmance on an abuse of discretion standard. We do likewise. ▮ Here, in the exercise of its discretion, the trial court refused to include the prejudgment interest in the calculation of its attorney fee award. We cannot conclude that this decision constituted a manifest abuse of discretion.[12]

▮ The Marshalls alone assert two further contentions. They argue that the trial court abused its discretion by applying a uniform standard to all plaintiffs' requests for attorney fees and disregarding the actual dollar impact on the individual plaintiffs. They further request that we award them attorney fees on appeal.

The Marshalls had a 33⅓ percent contingency fee agreement with their attorneys. As it did with several other plaintiffs, the court awarded attorney's fees of 30 percent of the jury verdict to the Marshalls. Since the Marshalls were awarded $1 by the jury, the attorney fee totals $.30. The paltriness of this award leads us to accept the Marshalls' contention.

The court's order awarding attorney fees, quoted *ante* in footnote 5, indicates that the court appropriately considered the number of hours expended by each lawyer, the reasonable hourly rate normally charged, the novelty and difficulty of the issues, the skill and experience of each attorney, the extent to which this litigation had precluded other employment by the attorney, the terms of the contingent fee arrangement, and the result obtained by the attorney. (See *Aetna Life & Casualty Co.* v. *City of Los Angeles, supra*, 170 Cal.App.3d at pp. 880-881.)

"The contingent nature of the fee contract is only one element of evidence of the value of the attorney's services; it is not controlling. [Citation.] A court is free to award reasonable attorney fees notwithstanding the contract for a contingent fee. [Citations.]" (170 Cal.App.3d at p. 881.) Moreover, the outcome of the trial is only one of the factors to be considered. An attorney should not be punished for the unbelievability of his or her clients. This was a three-week trial. This fact alone leads us to find that the court could not have exercised its discretion as to the Marshalls' request with an awareness of the fractional dollar amount being awarded. Thus, we remand to the trial court for a reconsideration of the award of attorney fees to the Marshalls.

Lastly, we consider and deny the Marshalls' request that we award them attorney fees on appeal. No authority has been cited for this proposition. In

[12] In its reply brief, Ransbottom states that the court failed to exercise its discretion, believing it had no choice. The court's comments, quoted *ante*, indicate the contrary.

fact, *Holtz* v. *San Francisco Bay Area Rapid Transit Dist., supra*, 17 Cal.3d at page 658, held that under the predecessor statute to Code of Civil Procedure section 1036, attorney fees should not be awarded in connection with prosecuting an appeal of an inverse condemnation action.

### DISPOSITION

As to the DWP appeal, the judgment is affirmed.

As to the Ransbottom appeal, the judgment is affirmed.

As to the Marshalls' appeal, the matter is remanded to allow the court to reconsider its award of attorney fees. In all other respects the judgment is affirmed.

Each party to bear its own costs on appeal.

Woods (A. M.), P. J., and George, J., concurred.

The petition of all appellants for review by the Supreme Court was denied July 11, 1990. Lucas, C. J., did not participate therein.